ORAL ARGUMENT NOT YET SCHEDULED

No. 22-1139

_____

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

CONCERNED HOUSEHOLD ELECTRICITY CONSUMERS COUNCIL,

Petitioners,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

Respondent

_____

On Consolidated Petitions for Review of Environmental Protection Agency
Final Order

_____

Consolidated with Case No. 22-1140

_____

BRIEF OF PETITIONERS

_____

Harry W. MacDougald                Francis Menton
Caldwell, Carlson, Elliott &       Law Office of Francis Menton
DeLoach LLP                        85 Broad Street, 18th floor
Two Ravinia Drive, Suite 1600      New York, New York 10004
Atlanta, Georgia  30346            (212) 627-1796
(404) 843-1956                     fmenton@manhattancontrarian.com
hmacdougald@ccedlaw.com

*Attorneys for Petitioners in Case No. 22-1139 and 22-1140*

October 14, 2022

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), the Petitioners state as follows:

**(A)    Parties and *Amici***

**<u>PETITIONERS</u>**:

**Case No. 22-1139**:

Concerned Household Electricity Consumers Council is an unincorporated association of the following individuals:

> Joseph D'Aleo
> Clement Dwyer, Jr.
> Scott Univer
> Robin Weaver
> James P. Wallace III

**Case No. 22-1140**:

FAIR Energy Foundation, a 501(c)(3) non-profit that is not owned by and has no interest in any other entity.

**<u>RESPONDENTS</u>:**

United States Environmental Protection Agency (Respondent in the consolidated cases)

**<u>RESPONDENTS' INTERVENORS</u>:**

American Lung Association
American Public Health Association
Appalachian Mountain Club
Clean Air Council
Clean Wisconsin
Environmental Defense Fund
National Parks Conservation Association
Natural Resources Council of Maine

**PETITIONERS' *AMICI CURIAE*:**

CO2 Coalition, Inc. (Richard Lindzen, Ph.D., and Will Happer, Ph.D.)
Ross McKitrick, Ph.D.
Tom Sheahen, PhD.

**RESPONDENTS' *AMICI CURIAE*:**

Unknown to Petitioners

**(B)    Rulings Under Review**

These petitions challenge EPA's Denial of Petitioners' Petitions to Reconsider the 2009 Endangerment Finding for GHGs. *See* Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act; Final Action on Petitions, 87 Fed. Reg. 25412 (Apr. 29, 2022) (referred to herein as the "Denial").

EPA published a link to the decision document in the Federal Register, but not the document itself. Pin point citations to the Denial will be to the page number of the Denial, previously filed with the Court.

**(C)    Related Cases**

A challenge to the underlying Endangerment Finding for Greenhouse Gases upon its initial promulgation was rejected by this Court in *Coal. for Responsible Regul., Inc. v. E.P.A.*, 684 F.3d 102, 120 (D.C. Cir. 2012), *aff'd in part, rev'd in part sub nom. Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 134 S. Ct. 2427, 189 L. Ed. 2d 372 (2014), and *amended sub nom. Coal. for Responsible Regul., Inc. v. Env't Prot. Agency*, 606 F. App'x 6 (D.C. Cir. 2015).

There are no pending related cases.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

TABLE OF CONTENTS.......................................................... iii

TABLE OF AUTHORITIES ....................................................vi

GLOSSARY...........................................................................x

INTRODUCTION ................................................................1

JURISDICTIONAL STATEMENT ......................................4

    I.    Agency Subject Matter-Jurisdiction......................................4

    II.    Jurisdiction of the Court of Appeals ....................................6

STATEMENT OF ISSUES .................................................6

STATEMENT OF THE CASE AND FACTS .......................7

    I.    Procedural History..............................................................7

    II.    Factual Background............................................................8

        A.    EPA's Attribution of Warming to Human Emissions was Based on Three Lines of Evidence. ............................8

        B.    Easily Understood Empirical Data Invalidate all Three Lines of Evidence and Attribution..............................9

            1.    Introduction........................................................9

            2.    Temperature Records........................................11

                (a) Fabricated Data..........................................11

                (b) Data Adjusted to Fit the Theory ...................13

                (c) After adjusting for natural factors, there is no statistically significant trend in 14 credible temperature time series................................14

            3.    Physical Understanding and Models ..................17

(a) The Explicit Criteria for Using Models for Attribution. .................................................17

(b) Predictions of Theory and Models ..............................20

(c) Observations Invalidate the Claimed Physical Understanding and Models............................................23

SUMMARY OF ARGUMENT ...............................................26

STANDING ..........................................................................30

ARGUMENT ........................................................................34

I.    The Denial of the Petitions for Reconsideration was Arbitrary and Capricious ................................................34

      A.    Introduction .................................................35

      B.    EPA's Defense of Attribution in Rejecting the Petitions is Arbitrary and Capricious..............................35

      C.    EPA's Critique of Wallace 2016, April 2017 and 2018 is Arbitrary and Capricious................................38

      D.    EPA's Analysis of Petitioners' Extreme Events Evidence is Arbitrary and Capricious. ...............................41

II.   The Extreme Deference Standard for Agency Scientific Determinations is Too Permissive for Decisions as Momentous as Reconsideration of the Endangerment Finding. ...........................45

III.  *Massachusetts v. EPA* Should be Revisited in Light of the Major Questions Doctrine. ......................................50

CONCLUSION ....................................................................59

APPENDIX A — STATUTORY ADDENDUM......................................60

I.    Clean Air Act Section 307, 42 U.S.C.A. § 7607................................60

II.   Clean Air Act § 302, 42 U.S.C. § 7602..............................68

III.  2 U.S.C. § 644 ......................................................71

IV.    5 U.S.C.A. § 553 ................................................................74

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME AND
TYPEFACE LIMITATIONS .........................................................77

CERTIFICATE OF SERVICE ..............................................................78

# TABLE OF AUTHORITIES

**Cases**

*Alabama Assn. of Realtors v. Department of Health and Human Servs.*, 594 U. S. ___, 141 S.Ct. 2485 (2021)................................................................53

*Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87 (1983)...........................................................................47

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ................46

*Coal. for Responsible Regul., Inc. v. E.P.A.*, 684 F.3d 102, 120 (D.C. Cir. 2012), *aff'd in part, rev'd in part sub nom. Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, (2014), and *amended sub nom. Coal. for Responsible Regul., Inc. v. Env't Prot. Agency*, 606 F. App'x 6 (D.C. Cir. 2015) .................... ii, 35, 46

*Daubert* v. *Merrell Dow Pharmaceuticals, Inc.,* 509 U. S. 579 (1993) .................40

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000)................ 53, 57

*Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 572 U.S. 559 (2014)................45

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ...............................40

*March v. Oregon Natural Resources Council*, 490 U.S. 360 (1989) .....................47

*Oljato Chapter of the Navajo Tribe v. Train*, 515 F.2d 654 (D.C. Cir. 1975) ......5, 6

*Pennsylvania Dept. of Corrections v. Yeskey*, 524 U.S. 206 (1998) .....................57

*PPG Indus., Inc. v. Costle*, 659 F.2d 1239 (D.C. Cir. 1981) ............................. 6, 34

*Scientists' Institute for Public Information v. Atomic Energy Commission*, 481 F.2d 1079 (D.C. Cir. 1973) ...............................................................33

*Utility Air Regulatory Group v. EPA*, 573 U.S. 302 (2014) 4, 29, 30, 53, 54, 55, 57, 58

*West Virginia v. EPA,* ___ U.S. ___, 142 S.Ct. 2587 (2022) 3, 4, 29, 49, 50, 52, 53, 54, 56, 57, 58

*Whitman v. American Trucking Assns., Inc.*, 531 U.S. 457 (2001) .........................53

**Statutes**

2 U.S.C. § 644 ................................................................................58

42 U.S.C. § 7602(g) ........................................................... 4, 51, 52, 56, 58

*Authorities upon which we chiefly rely are marked with asterisks.*

42 U.S.C. § 7607 ............................................................................ 4, 5, 7, 46

5 U.S.C. § 553(e) .................................................................................... 6, 34

Clean Air Act § 132(d)(4) ...........................................................................58

H.R. 5376, Public Law No. 117-19 ............................................................58

**Other Authorities**

Einstein, A., *Physics and reality*, DAEDALUS, Fall, 2003, Vol. 132, No. 4, *On Science* (Fall, 2003), pp. 22-25 ................................................................48

Emily Meazell, *Super Deference, The Science Obsession, and Judicial Review as Translation of Agency Science*, 109 MICHIGAN L. REV. 733 (2011) ...............46

H.R. Rep. 95-294 (May 12, 1977) ..............................................................5

S. Con. Res. 14 (117th Congress) ................................................................58

**Regulations**

Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act; Final Action on Petitions, 87 Fed. Reg. 25412 (Apr. 29, 2022) ........ ii, 2, 3, 6, 27, 28, 30, 33, 34, 35, 38, 42, 44, 45, 47, 59

Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act" (74 F.R. 66496, Dec. 15, 2009) ii, 1, 2, 3, 4, 5, 6, 7, 8, 10, 11, 13, 15, 23, 25, 26, 27, 28, 30, 32, 33, 34, 35, 41, 42, 43, 44, 45, 49, 59

**Other References**

*2021 Total System Electric Generation*, available at https://www.energy.ca.gov/data-reports/energy-almanac/california-electricity-data/2020-total-system-electric-generation .........................................30

*Clean Energy Wire: What German households pay for power,* available at https://www.cleanenergywire.org/factsheets/what-german-households-pay-power ......................................................................................................31

*Climate Stabilization Targets: Emissions, Concentrations and Impacts over Decades to Millennia,* NATIONAL RESEARCH COUNCIL (2011), available at https://nap.nationalacademies.org/catalog/12877/climate-stabilization-targets-emissions-concentrations-and-impacts-over-decades-to ..........................19

*Electric Power Monthly*, *Table 5.6.A. Average Price of Electricity to Ultimate Customers by End-Use Sector*, available at https://www.eia.gov/electricity/monthly/epm_table_grapher.cfm?t=epmt_5_6_a ...........................................................................................................31

Ferguson, et al, *Publishing: The peer-review scam*, NATURE, Vol. 515, pp. 4800481 (2014) (available at https://www.nature.com/articles/515480a.............39

*Germany's renewables electricity generation grows in 2015, but coal still dominant,* (May 24, 2016) available at http://www.eia.gov/todayinenergy/detail.php?id=26372 .....................................31

J. Christy, R. Spencer, W. Braswell, R. Junod, *Examination of space-based bulk atmospheric temperatures used in climate research*, INTERNATIONAL JOURNAL OF REMOTE SENSING, 39:11, 3580-3607 (2018)....................................15

J. Ioannidis, *Why most published research findings are false*, PLOS MED. (Aug. 2, 2005, p. 8), available at https://pubmed.ncbi.nlm.nih.gov/16060722/ .............39

J. Wallace, J. Christy, J. D'Aleo, *On the Existence of a "Tropical Hot Spot" & The Validity of EPA's* $CO_2$ *Endangerment Finding, Abridged Research Report* (2016) ......................................................................... 16, 25, 39

J. Wallace, J. Christy, J. D'Aleo, *On the Existence of a "Tropical Hot Spot" & The Validity of EPA's* $CO_2$ *Endangerment Finding, Abridged Research Report, Second Edition* (April 2017) ............................................................ 14, 39

J. Wallace, J. D'Aleo & C. Idso, *Comment on "Examination of space-based bulk atmospheric temperatures used in climate research" by John R. Christy et al.* (2018) ......................................................................... 15, 16, 25

J. Wallace, J. D'Aleo C. Idso, *On the Validity of NOAA, NASA and Hadley CRU Global Average Surface Temperature Data & The Validity of EPA's CO2 Endangerment Finding, Abridged Research Report.* (Jun. 2017) ........ 13, 39

J. Wallace, J. D'Aleo, C. Idso, *Addendum to the Research Report entitled: On the Validity of NOAA, NASA and Hadley CRU Global Average Surface Temperature Data & The Validity of EPA's CO2 Endangerment Finding, Abridged Research Report* (2019) .....................................................................12

K. Richard, *There Has Been No 'Global' Warming In The Southern Hemisphere, Equatorial Regions*, NOTRICKSZONE May 4, 2017, available at https://tinyurl.com/ymdws9mf.................................................................12

Kirye and Pierre Gosselin, *MIT Doctorate Climate Scientist Slams GW Claims: Based On "Untrustworthy, Falsified Data"... "No Scientific Value"!*, NOTRICKSZONE, available at https://tinyurl.com/2p9bk9pm .............................12

Kirye and Pierre Gosselin, *NASA GISS Surface Station Temperature Trends Based On Sheer Guess Work, Made-Up Data, Says Japanese Climate Expert*, NOTRICKSZONE, available at https://tinyurl.com/y6rxtwd7 .................................12

President Dwight D. Eisenhower's *Farewell Address*, Jan. 17, 1961 (available at https://www.archives.gov/milestone-documents/president-dwight-d-eisenhowers-farewell-address ...................................................................... 2, 3, 29

R. Bradley, Jr., *Energy as the Master Resource: Where Left, Right, and Center Agree*, MASTER RESOURCE, available at https://www.masterresource.org/about-masterresource/energy-as-the-master-resource-where-left-right-and-center-agree/ ........................................................... 1

Richard Feynman, Cornell Lecture, available at https://www.youtube.com/watch?v=b240PGCMwV0 ......................................... 10

Richard Feynman, *What is Science*? available at http://www.feynman.com/science/what-is-science/ ............................................. 49

S. Haack, *Trial and Error: The Supreme Court's Philosophy of Science*, AMERICAN JOURNAL OF PUBLIC HEALTH (July 2005), available at https://tinyurl.com/mxjh5m9w ............................................................................ 48

Smith, R., *Peer Review: a flawed process at the heart of science and journals*, JOURNAL OF THE ROYAL SOCIETY OF MEDICINE, Apr. 2006, Vol. 99(4) pp. 178-182, *available at* https://tinyurl.com/yc6zzafm (last visited Oct. 13, 2022) ............................................................................................................... 39

U.S. Climate Change Science Program, Synthesis and Assessment Product 1.1 (2006), available at https://www.globalchange.gov/browse/reports/sap-11-temperature-trends-lower-atmosphere-steps-understanding-reconciling 13, 20, 23

U.S. Climate Change Science Program, Synthesis and Assessment Product 1.3, available at https://www.globalchange.gov/browse/reports/sap-13-reanalysis-historical-climate-data-key-atmospheric-features-implications ........................... 19

U.S. House Committee on Science, Space & Technology. March 29, 2017, Testimony of John R. Christy, available at https://science.house.gov/imo/media/doc/Christy%20Testimony_1.pdf?1 .. 17, 24

# GLOSSARY

| | |
|---|---|
| Act | Clean Air Act |
| Agency | U.S. Environmental Protection Agency |
| AR4 | Intergovernmental Panel on Climate Change's Fourth Assessment Report |
| AR5 | Intergovernmental Panel on Climate Change's Fifth Assessment Report |
| CAA | Clean Air Act |
| U.S. CCSP or CCSP | U.S. Climate Change Science Program |
| $CH_4$ | Methane |
| CHECC | Concerned Household Electricity Consumers Council |
| $CO_2$ | Carbon Dioxide |
| Denial | Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act; Final Action on Petitions, 87 Fed. Reg. 25412 (Apr. 29, 2022) |
| Endangerment Finding | Final Rule, Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act, 74 Fed. Reg. 66,496 (Dec. 15, 2009) (JA__) |
| EPA | U.S. Environmental Protection Agency |
| Finding | Endangerment Finding, *see above* |
| FEF | FAIR Energy Foundation |
| GAST | Global Average Surface Temperature |
| GHG(s) | Greenhouse gas(es) |
| IPCC | Intergovernmental Panel on Climate Change |
| kWh | Kilowatt-hour |
| $N_2O$ | Nitrous Oxide |
| NOAA | National Oceanic and Atmospheric Administration |
| NASA | National Aeronautics and Space Administration |
| NRC | National Research Council |
| SAP | U.S. Climate Change Science Program Synthesis and Assessment Product |
| THS | Tropical Hot Spot |

| TSD | Technical Support Document for Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act (Dec. 7, 2009) (JA__) |
| UN | United Nations |
| USGCRP | United States Global Change Research Program |

## INTRODUCTION

In the United States, EPA's Endangerment Finding for Greenhouse Gases is the *sine qua non* of climate policy; it lies at the root of all of the government's attempts to fix the weather by limiting the use of fossil fuels. Based on the Greenhouse Gas ("GHG") Endangerment Finding, our government has embarked on a technically and economically impossible crusade to decarbonize the U.S. economy. While its proponents claim and may believe they are on a noble quest to save the world, there is no chance that US climate policy will have any measurable effect on climate whatsoever. Energy is the "master resource"[1] and restricting it supply and making it more expensive unleashes a synergistic cascade of ill effects on human health and welfare by driving up energy prices and undermining energy, economic, food and national security of the U.S. and its allies. To boot, our most ruthless adversaries around the world are enriched and empowered.

Fossil fuels are indispensable to modern civilization and human flourishing. In America, they were cheap and abundant just two years ago. Since then, climate policies in the U.S. and especially in Europe have made them scarce and expensive, which has been compounded by supply disruptions arising from the war

---

[1] *See*, R. Bradley, Jr., *Energy as the Master Resource: Where Left, Right, and Center Agree*, MASTER RESOURCE, available at https://www.masterresource.org/about-masterresource/energy-as-the-master-resource-where-left-right-and-center-agree/ (last visited Oct. 14, 2022).

in Ukraine. As a result, energy price shocks are causing both rampant inflation and sharp economic contraction in the U.S. and especially in Europe.

Crippling increases in energy costs and economic devastation are not the only ill effects of these polices. Scarcity and price shocks in natural gas have increased fertilizer prices by several times, which portends much less production and application of fertilizer and significantly lower global food production. Food shortages caused by climate policies will cause untold misery and privation around the world, and not just for the poor, but especially for the poor.

In short, climate policy is a far greater threat to human health and welfare than human-caused climate change.

The Petitions for Reconsideration of the Endangerment Finding at issue in this case were filed because the Endangerment Finding's conclusion that human emissions of GHGs are the cause of global warming that endangers human health and welfare rests on a pyramid of fraud and logical fallacies. These Petitions were based on data and analyses coming to light well after the 2009 Endangerment Finding was adopted. This appeal was filed because EPA's Denial of the Petitions was arbitrary and capricious and does not rest on reasoned decision making.

In his farewell address, President Eisenhower warned that the domination of scientific research by federal funding was "gravely to be regarded," and that we must "be alert to the danger that public policy could itself become the captive of a

scientific-technological elite."[2] These dangers have materialized in climate policy, and we now face the dystopian consequences of attempting to manage the weather by depriving humanity of the energy resources that have been indispensable to the spectacular and historic flourishing of the human race since the dawn of the steam age.

Agency scientific findings are shielded by a legal citadel, the "extreme deference" standard of review. Even under this seldom-fatal standard of review, it is amply evident that EPA's Denial of the Petitions was arbitrary and capricious.

Petitioners also contend that for such a massively consequential decision as the regulation of GHGs, especially $CO_2$ and Methane, the major questions doctrine teaches that something more than perfunctory review under the extreme deference standard is required.

The Petition of the FAIR Energy Foundation also contended that *Massachusetts v. EPA,* 549 U.S. (2007), erred in holding that $CO_2$ was an air pollutant within the meaning of the Clean Air Act. Without that decision there would be no Endangerment Finding. Under the major questions doctrine as most recently articulated in *West Virginia v. EPA,* ___ U.S. ___, 142 S.Ct. 2587 (2022). the issue in *Massachusetts v. EPA* was a "major question."  The decision in

---

[2] President Dwight D. Eisenhower's *Farewell Address*, Jan. 17, 1961 (available at https://www.archives.gov/milestone-documents/president-dwight-d-eisenhowers-farewell-address, last visited Oct. 5, 2022).

*Massachusetts v. EPA* should be revisited because there is no clear statement by Congress in the statute in question in that case, 42 U.S.C. § 7602(g), that it intended for EPA to have regulatory authority over GHG emissions, the broadest claim of regulatory authority in U.S. history. $CO_2$ emissions are ubiquitous to human activity and are irrefutably indispensable to the daily survival of billions of people against the hazards of nature untamed. Fossil fuels have contributed more to improving human health and welfare and the material quality of human life than any other substance in human history. EPA's claim of authority to regulate GHG emissions in order to manage the climate must therefore rest on a very clear statement from Congress and a very robust scientific foundation, neither of which is present.

Two major EPA attempts to regulate GHG emissions after *Massachusetts v. EPA* and the Endangerment Finding have already been invalidated under the major questions doctrine. *See Utility Air Regulatory Group v. EPA*, 573 U.S. 302 (2014) and *West Virginia v. EPA*. This pattern of regulatory overreach should be addressed at its source: *Massachusetts v. EPA* itself and the Endangerment Finding.

## JURISDICTIONAL STATEMENT

### I.    AGENCY SUBJECT MATTER-JURISDICTION

The Petitions at issue in this appeal were filed pursuant 42 U.S.C. § 7607(d), to convene a proceeding for reconsideration of the "Endangerment and Cause or

4

Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act" (74 F.R. 66496, Dec. 15, 2009) (original EPA Docket No. Docket EPA-HQ-OAR-2009-171) ("the Endangerment Finding").

Under 42 U.S.C. § 7607(d)(7)(B), EPA is required to convene a proceeding for reconsideration upon a showing of two conditions: (1) the information arose after the period for public comment on the Endangerment Finding and (2) the objection is of "central relevance to the outcome of the rule." Petitioners met these requirements.

In *Oljato Chapter of the Navajo Tribe v. Train*, 515 F.2d 654 (D.C. Cir. 1975),[3] the Court set out a three-step process for EPA to follow in handling petitions for reconsideration under the Clean Air Act:

> (1) The person seeking revision of a standard of performance, or any other standard reviewable under Section 307, should petition EPA to revise the standard in question. The petition should be submitted together with supporting materials, or references to supporting materials. (2) EPA should respond to the petition and, if it denies the petition, set forth its reasons. (3) If the petition is denied, the petitioner may seek review of the denial in this court pursuant to Section 307.

*Id*. at 666. In *Oljato Tribe* the Court explained that "the public's right to petition the Administrator for revision of a standard of performance and the Administrator's duty to respond substantively to such requests *exist completely independently of*

---

[3] The Clean Air Act's legislative history makes clear that "the committee bill confirms the court's decision in *Oljato Chapter of the Navajo Tribe v. Train*, 515 F.2d 654 (D.C. Cir. 1975)." *See* H.R. Rep. 95-294, at 323 (May 12, 1977).

*Section 307 and this court's appellate jurisdiction*." 515 F.2d at 667 (emphasis added).

Alternatively, amendment or repeal of a Clean Air Act regulation may also be sought under 5 U.S.C. § 553(e) or Section 307(d)(7)(B), even well outside the 60-day review window in *PPG Indus., Inc. v. Costle*, 659 F.2d 1239, 1250 (D.C. Cir. 1981). Both Petitions also sought reconsideration of the Endangerment Finding under 5 U.S.C. § 553(e). *See* CHECC Original Petition, p. 4, n. 2; Fair Energy Foundation's Petition, pp. 3-6.

## II.    Jurisdiction of the Court of Appeals

This Court has jurisdiction because the EPA's Denial of the Petitions was a final agency action subject to appellate review under *Oljato Tribe*. Timely Petitions for Review were filed by CHECC and FAIR Energy Foundation ("FEF").

## STATEMENT OF ISSUES

I.    Whether EPA's was arbitrary and capricious in denying the Petitions for Reconsideration?

II.    Whether the extreme deference standard of review for agency scientific determinations is appropriate for reviewing EPA's Denial of the Petitions for Reconsideration of the Endangerment Finding for GHGs in light of the significance of the question and the major questions doctrine?

6

III.    Whether the holding of *Massachusetts v. EPA,* 549 U.S. (2007) that the term "air pollutant" in the Act-wide definition at 42 U.S.C. § 7607(g) includes GHGs should be revisited in light of the major questions doctrine?

## STATEMENT OF THE CASE AND FACTS

### I.    PROCEDURAL HISTORY

CHECC, the Concerned Household Electricity Consumers Council, filed its Petition for Reconsider of the Endangerment Finding on January 20, 2017. Thereafter, it supplemented the Petition seven times. On January 19, 2021, the Administrator of the EPA sent a relatively short letter denying the Petition, as well as several others that had been filed by other groups. Then, on March 23, 2021, the new Administrator for the Biden Administration withdrew the denial on the grounds that it was not sufficiently grounded in science. CHECC then submitted its Seventh Supplement.

FAIR Energy Foundation filed its Petition for Reconsideration in May 2019, essentially adopting the science arguments made by CHECC, and making a number of others besides. FAIR also challenged the decision in *Massachusetts v. EPA,* 549 U.S. (2007) on separation of powers grounds.

EPA denied the Petitions in a decision published in the Federal Register on April 29, 2022, Endangerment and Cause or Contribute Findings for Greenhouse

Gases Under Section 202(a) of the Clean Air Act; Final Action on Petitions, 87 Fed. Reg. 25412.

CHECC and FAIR Energy Foundation timely filed Petitions for Review. FEF's Petition for review, Case No. 22-1140, was consolidated into CHECC's Petition, Case No. 22-1139.

## II.   FACTUAL BACKGROUND

### A.   EPA's ATTRIBUTION OF WARMING TO HUMAN EMISSIONS WAS BASED ON THREE LINES OF EVIDENCE.

In the original Endangerment Finding, at 74 C.F.R page 66,518, EPA said that it attributed "observed climate change" to "anthropogenic activities" based on three lines of evidence. This is the basis for the Finding that human GHG emissions endanger human health and welfare:

> The attribution of observed climate change to anthropogenic activities is based on multiple lines of evidence. The *first* line of evidence arises from our basic physical understanding of the effects of changing concentrations of greenhouse gases, natural factors, and other human impacts on the climate system. The *second* line of evidence arises from indirect, historical estimates of past climate changes that the changes in global surface temperature over the last several decades are unusual. The *third* line of evidence arises from the use of computer-based climate models to simulate the likely patterns of response of the climate system to different forcing mechanisms (both natural and anthropogenic).

(Emphasis added).

A critical and distinctive feature of the first "line of evidence," the "basic physical understanding" of climate, is that the theory predicts that human-caused

warming would present a distinctive fingerprint,  a "tropical hot spot," according to which in the tropics, the upper troposphere would warm faster than the lower troposphere, and the lower troposphere would warm faster than the surface, all due to rising atmospheric GHG concentrations blocking heat transfer into outer space. Based on this Tropical Hot Spot (THS) theory/mechanism, increasing GHG concentration is predicted to increase surface temperatures.

The second "line of evidence," based on temperature records, refers to EPA's claim that GASTs (global average surface temperatures) have been rising in an anomalous and dangerous fashion since the mid-20th century.

The third "line of evidence" is based on climate models. EPA uses climate models to "attribute" warming to human GHG emissions, and to set regulatory policy. EPA uses models for attribution by claiming that observed warming cannot be reproduced by climate models without including the warming effects of human GHG emissions. EPA reasons that it does not know what else could be causing the warming, so it must be caused by human GHG emissions. This is not how real science, or even simple logic, actually works.

B.     Easily Understood Empirical Data Invalidate all
       Three Lines of Evidence and Attribution.

1.    Introduction

The Petitions, relying on empirical data, invalidate all three lines of evidence.

9

Science – that is, real science, rather than a government-enforced orthodoxy – is an exercise in testing hypotheses against observations.  As the great physicist Richard Feynman stated in his most famous quote:

> First, we guess it (audience laughter), no, don't laugh, that's the truth. Then we compute the consequences of the guess, to see if this law we guess is right, to see what it would imply. Then we compare the computation results to nature, or we say compare to experiment or experience, compare it directly with observations to see if it works. If it disagrees with experiment, it's WRONG. In that simple statement is the key to science. It doesn't make any difference how beautiful your guess is, it doesn't matter how smart you are, or who made the guess, or what his name is—If it disagrees with experiment, it's WRONG. That's all there is to it.

Richard Feynman, Cornell Lecture, available at

https://www.youtube.com/watch?v=b240PGCMwV0  (last visited Oct. 13, 2022).

If a proposition is contradicted or unsupported by valid empirical data, no amount of appeal to authority and consensus and degrees and credentials can change that. That is the position EPA finds itself in with the Endangerment Finding.  And it does not take a "scientist" to point out obvious flaws in logic and evidence. Anyone of normal intelligence can see that EPA is blowing smoke, and the Petitions simply pointed out the most obvious examples of that.

First, the Petitions show that the official temperature records relied on by EPA to show warming temperatures in fact use fabricated average surface temperature data for vast regions of the earth's surface for much of that record. This fact invalidates not only the surface temperature records line of evidence but

10

also the physical understanding and models as well because to be valid themselves they both require valid temperature data.

Second, multiple separate and distinct econometric structural analyses of more than a dozen different credible temperature time series records show that after adjusting for natural factors, there has been no statistically significant trend in temperature in any of these time series.

Third, the Petitions show that the key assumption supporting the global warming claim and the theory in all models, the Tropical Hot Spot theory, is invalidated by the fact that there is, in fact, no trend in natural-factor-adjusted temperature data in the tropics.

2. Temperature Records

(a) *Fabricated Data*

The validity of EPA's 2009 $CO_2$ Endangerment Finding requires global average surface temperature ("GAST") data to be a valid representation of reality.

Over the period 1900-2000, essentially no credible temperature data were captured monthly for the vast oceans of the Southern Hemisphere. Thus, over this period, there is essentially no data for 40% plus of the surface of the Earth. This follows from the fact that the Southern Hemisphere's surface is over 80.9% ocean (i.e., 0.50*0.809 = 0.405). *See* Seventh Supplement, p. 5, *citing* J. Wallace, J. D'Aleo, C. Idso, *Addendum to the Research Report entitled: On the Validity of*

11

*NOAA, NASA and Hadley CRU Global Average Surface Temperature Data & The Validity of EPA's CO2 Endangerment Finding, Abridged Research Report* (2019), citing, *inter alia*, K. Richard, *There Has Been No 'Global' Warming In The Southern Hemisphere, Equatorial Regions*, NOTRICKSZONE May 4, 2017, available at https://tinyurl.com/ymdws9mf (last visited Oct. 14, 2022).

But far more than 40% of the planet has missing average surface temperature data. As a Japanese scientist stated in 2019, the data foundation underpinning global warming science is "untrustworthy," and "[t]he global surface mean temperature change data no longer have any scientific value and are nothing except a propaganda tool to the public." (*See* Kirye and Pierre Gosselin, *NASA GISS Surface Station Temperature Trends Based On Sheer Guess Work, Made-Up Data, Says Japanese Climate Expert*, NOTRICKSZONE, available at https://tinyurl.com/y6rxtwd7 (last visited Oct. 13, 2022); Kirye and Pierre Gosselin, *MIT Doctorate Climate Scientist Slams GW Claims: Based On "Untrustworthy, Falsified Data"… "No Scientific Value"!*, NOTRICKSZONE, available at https://tinyurl.com/2p9bk9pm (last visited Oct. 13, 2022); (over the last 100 years "only 5 percent of the Earth's area is able show the mean surface temperature with any certain degree of confidence.")

No valid global average surface temperature record can be constructed with such huge gaps in coverage in time and space. Thus, the lack of data in the

Southern Hemisphere alone is fatal to the validity of the GAST record. This GAST data invalidity also necessarily invalidates both the physical understanding and the climate model lines of evidence because their validity logically and mathematically requires valid and reliable temperature data for the entire globe for a very, very long period to identify and characterize—if possible—the natural behavior of an exquisitely complex chaotic non-linear system which has multiple overlapping natural cycles in solar, volcanic and oceanic influences. Such credible data simply do not exist for a long enough time period over enough of the globe to reliably do so. *See* U.S. Climate Change Science Program, Synthesis and Assessment Product 1.1 (2006), available at https://www.globalchange.gov/browse/reports/sap-11-temperature-trends-lower-atmosphere-steps-understanding-reconciling (last visited Oct. 14, 2022) ("SAP 1.1"), Chapter 2. On the other hand, there are ample and credible empirical data to conclusively *invalidate* the Tropical Hot Spot theory embedded in the climate models.

(b)    *Data Adjusted to Fit the Theory*

Other problems with the GAST record also invalidate the Endangerment Finding. The Second Supplement to CHECC's Petition was based on J. Wallace, J. D'Aleo C. Idso, *On the Validity of NOAA, NASA and Hadley CRU Global Average Surface Temperature Data & The Validity of EPA's CO2 Endangerment Finding, Abridged Research Report*. (Jun. 2017) ("Wallace (Jun. 2017)").

13

In this report, past changes to the previously reported historical data were quantified. Each new version of GAST data has nearly always exhibited a steeper warming linear trend, and it was nearly always accomplished by the entities providing GAST data measurement, NOAA, NASA and Hadley CRU (Climatic Research Unit), systematically removing the previously existing cyclical temperature pattern.

The magnitude of their adjustments of historical data that removed their cyclical temperature patterns was totally inconsistent with published and credible U.S. and other temperature data. Thus, apart from crippling gaps in temporal and spatial coverage, temperature records are also subject to constant adjustments to enhance the case for attribution, straining credulity past the breaking point.

Therefore, despite current claims of record setting warming, it is impossible to conclude from the NOAA, NASA and Hadley CRU GAST data sets that recent years have been the warmest in the observational record.

(c)    *After adjusting for natural factors, there is no statistically significant trend in 14 credible temperature time series.*

The Seventh Supplement to CHECC's Petition cited J. Wallace, J. Christy, J. D'Aleo, *On the Existence of a "Tropical Hot Spot" & The Validity of EPA's* $CO_2$ *Endangerment Finding, Abridged Research Report, Second Edition* (April 2017). (Wallace (Apr. 2017). This report failed to find that the steadily rising atmospheric

14

$CO_2$ has had a statistically significant impact on any of the 14 temperature data sets analyzed. The tropospheric and surface temperature data measurements that were analyzed were taken by many different independent entities using balloons, satellites, buoys and various land-based techniques. The results were the same for all of these diverse and independent datasets, making the findings highly credible.

The analysis clearly demonstrates that once the solar, volcanic and oceanic activity, that is, natural factor impacts on temperature data are accounted for, there is no warming trend in the data at all. These findings invalidate both the Tropical Hot Spot theory and the climate models that EPA relies upon for attribution, and thus invalidate the Endangerment Finding as a whole.

A separate paper came to the same conclusion, that it is all but certain that EPA's basic claim that $CO_2$ is causing anomalous warming is false. *See* J. Wallace, J. D'Aleo & C. Idso, *Comment on "Examination of space-based bulk atmospheric temperatures used in climate research" by John R. Christy et al.* (2018) (Wallace (2018) and citations therein. (Cited in 7th Supp. p. 10) This paper commented on J. Christy, R. Spencer, W. Braswell, R. Junod, *Examination of space-based bulk atmospheric temperatures used in climate research*, INTERNATIONAL JOURNAL OF REMOTE SENSING, 39:11, 3580-3607 (2018).[4]

---

[4] Available at: https://www.tandfonline.com/doi/full/10.1080/01431161.2018.1444293 (last visited Oct. 14, 2022).

15

The Wallace (2018) report used econometric methods specifically designed for structural analysis of time series data that were shown in the April 2017 research cited above to be highly credible when applied to data such as the UAH (University of Alabama Huntsville) satellite temperature data.

Like Wallace (2017), Wallace (2018) dealt explicitly with the methods required to develop a mathematically valid proof that $CO_2$ has had a statistically significant impact on the Earth's temperature over the period covered by data from balloons (59 years) and satellites (37 years). These methods were applied to the data and analysis in the Christy, et al. paper and prove again that increasing atmospheric $CO_2$ concentrations did not have a statistically significant impact on the UAH TLT 6.0 temperature data set over the period 1979 to 2016.

The superiority of the econometrics-based statistical methodology used in Wallace (2016)[5] and its progeny over climate models is made especially clear by the failure of models to match observations. A cogent explanation of why was provided in Congressional testimony by Dr. John Christy:

> The advantage of the simple statistical treatment [referring to Wallace (2016)] is that the complicated processes such as clouds, ocean-atmosphere interaction, aerosols, etc., are implicitly incorporated by the statistical relationships discovered from the actual data. Climate models attempt to calculate these highly non-linear processes from imperfect parameterizations (estimates) whereas the statistical model directly accounts for them since the bulk atmospheric temperature is the

---

[5] J. Wallace, J. Christy, J. D'Aleo, *On the Existence of a "Tropical Hot Spot" & The Validity of EPA's* $CO_2$ *Endangerment Finding, Abridged Research Report* (2016) ("Wallace (2016)").

16

response-variable these processes impact. It is true that the statistical model does not know what each sub-process is or how each might interact with other processes. But it also must be made clear: it is an understatement to say that no IPCC climate model accurately incorporates all of the nonlinear processes that affect the system. I simply point out that *because the model is constrained by the ultimate response variable (bulk temperature), these highly complex processes are included*.

The fact that this statistical model explains 75-90 percent of the real annual temperature variability, depending on dataset, using these influences (ENSO, volcanoes, solar) is an indication the statistical model is useful. - - - - This result promotes the conclusion that this approach achieves greater scientific (and policy) utility than results from elaborate climate models which on average fail to reproduce the real world's global average bulk temperature trend since 1979.

U.S. House Committee on Science, Space & Technology. March 29, 2017, Testimony of John R. Christy, pp. 10-11. ("Christy Testimony")[6] (Emphasis added).

### 3.    Physical Understanding and Models

(a)    *The Explicit Criteria for Using Models for Attribution.*

The explicit criteria for using models to detect and attribute global warming to anthropogenic GHG emissions is that they are capable of valid and reliable simulations of the climate system, both *with* and *without* the effect, or "forcing" of such emissions.

---

[6] Available at https://science.house.gov/imo/media/doc/Christy%20Testimony_1.pdf?1, (last visited Oct. 14, 2022).

The Endangerment Finding and its Technical Support Document ("TSD")

explicitly premised their reliance on models for attribution upon their ability to

simulate the climate both with and without anthropogenic influences:

> Climate model simulations by the IPCC, shown in Figure 5.1, suggest *natural forcings alone cannot explain the observed warming* (for the globe, the global land and global ocean). ***The observed warming can only be reproduced with models that contain both natural and anthropogenic forcings.***

TSD, p. 49 (emphasis added). This statement equates to saying we do not know

what else it could be, so it must be human GHG emissions. Classically, this

exemplifies the logical fallacy of argument from ignorance.

The IPCC's Fifth Assessment Report ("AR5"), available at

https://www.ipcc.ch/assessment-report/ar5/ (last visited Oct. 14, 2022), explained

the same point:

> The evaluation of model simulations of historical climate is of direct relevance to detection and attribution (D&A) studies (Chapter 10) *since these rely on model-derived patterns (or 'fingerprints') of climate response to external forcing, and on the ability of models to simulate decadal and longer-time scale internal variability* (Hegerl and Zwiers, 2011).

AR5, Section 9.8.2. (Emphasis added).

The National Climate Assessment 2014 (NCA 2014) Appendix 3, Message

4,[7] also makes explicit that detection and attribution of anthropogenic global

---

[7] Available at https://www.fs.usda.gov/ccrc/resources/national-climate-assessment-2014 (last visited Oct. 14, 2022).

18

warming relies on models' ability to accurately simulate climate with and without

human effects:

> Climate simulations are used to test hypotheses regarding the causes of observed changes. First, simulations that include changes in both natural and human forcings that may cause climate changes, such as changes in energy from the sun and increases in heat-trapping gases, are used to characterize what effect those factors would have had working together. Then, simulations with no changes in external forcings, only changes due to natural variability, are used to characterize what would be expected from normal internal variations in the climate. The results of these simulations are compared to observations to see which provides the best match for what has really occurred.

NCA 2014, Appendix 3, pp. 750-751. *See also Climate Stabilization Targets:*

*Emissions, Concentrations and Impacts over Decades to Millennia,* NATIONAL

RESEARCH COUNCIL (2011) Section 1.2, p. 53, available at

https://nap.nationalacademies.org/catalog/12877/climate-stabilization-targets-

emissions-concentrations-and-impacts-over-decades-to (last visited Oct. 14, 2022)

("Formal detection and attribution of an anthropogenic influence over the physical

climate system is based on analysis of spatial and temporal patterns in observations

of climate parameters *and on comparison of their statistical characteristics with*

*those of the same patterns as simulated by climate models.*" (Emphasis added)),;

U.S. Climate Change Science Program, Synthesis and Assessment Product 1.3

("SAP 1.3"), available at https://www.globalchange.gov/browse/reports/sap-13-

reanalysis-historical-climate-data-key-atmospheric-features-implications (last

visited Oct. 14,2 022) , p. 59 (describing the logic of using models in attribution in

similar terms). All of these authorities are making exactly the same point.

Thus, the TSD and assessment literature on which EPA relies *all* clearly state that the premise of using models in attribution is that climate models are valid and are unable to reproduce observed warming without the additional forcing from anthropogenic GHGs. Wallace (2016, April 2017 and 2018) demonstrate that this premise is false.

(b)    *Predictions of Theory and Models*

A critical and necessary component of both the "physical understanding" of climate and climate modeling is the Tropical Hot Spot. The Tropical Hot Spot is explained in U.S. Climate Change Science Program, Synthesis and Assessment Product 1.1, Temperature Trends in the Lower Atmosphere - Understanding and Reconciling Differences, ("SAP 1.1"), Chapter 1, § 1.1, The Thermal Structure of the Atmosphere, p. 17- 19,[8] explicitly relies upon the Tropical Hot Spot:

> The presence of such greenhouse gases (e.g., carbon dioxide, methane, nitrous oxide, halocarbons) increases the radiative heating of the surface and troposphere. … In general, the lapse rate can be expected to decrease with warming **such that temperature changes aloft exceed those at the surface.**

(Emphasis added). This same report depicted the Tropical Hot Spot graphically in figure 1.3, p. 25, as follows:

---

[8] Available at https://www.gfdl.noaa.gov/bibliography/related_files/vr0603.pdf  (last visited Oct. 4, 2022).



Similarly, the IPCC's Fourth Assessment Report ("AR4"), available at https://www.ipcc.ch/assessment-report/ar4/, (last visited Oct. 14, 2022) also states unequivocally that the Tropical Hot Spot is an integral feature of the "physical understanding" of the climate's hypothesized greenhouse warming mechanism. "Greenhouse gas forcing is expected to produce warming in the troposphere, … ." IPCC AR4 WG1 § 9.2.2.[9]  This is demonstrated by AR4 WG1, The Physical Science Basis, Chapter 9, Figure 9.1. Panel (c) shows the modeled effect of GHGs alone, while Panel (f) shows the modeled impact of all forcings, and both clearly depict the Tropical Hot Spot.

---

[9] Available at https://archive.ipcc.ch/publications_and_data/ar4/wg1/en/ch9s9-2-2.html (last visited Oct. 4, 2022).



Figure 9.1. Zonal mean atmospheric temperature change from 1890 to 1999 (°C per century) as simulated by the PCM model from (a) solar forcing, (b) volcanoes, (c) well-mixed greenhouse gases, (d) tropospheric and stratospheric ozone changes, (e) direct sulphate aerosol forcing and (f) the sum of all forcings. Plot is from 1,000 hPa to 10 hPa (shown on left scale) and from 0 km to 30 km (shown on right). See Appendix 9.C for additional information. Based on Santer et al. (2003a).

The text accompanying this figure explains that "The major features shown in Figure 9.1 *are robust to using different climate models*," which means that the Tropical Hot Spot is a feature of all the models. (Emphasis added).

In adopting the Endangerment Findings, EPA irrevocably placed primary reliance on the US CCSP reports and IPCC AR4. *See* TSD Box 1.1, p 4.

        (c)    *Observations Invalidate the Claimed Physical Understanding and Models.*

The CCSP report cited above said that if the Hot Spot were missing, it would be a "*potentially serious inconsistency*." U.S. CCSP SAP 1.1, p. 11. (Emphasis added). EPA also acknowledged in the Technical Support Document for the Endangerment Finding that if the Hot Spot were missing it would be "an important inconsistency." TSD p. 50.

Dr. John Christy, in the previously cited Congressional testimony, presented a comprehensible version of AR5 Figure 10.SM.1, panel (b), in which the Tropical Hot Spot would be visible if it actually existed. Christy's chart rewards a mere moment's review, for it makes plain that observations invalidate the predictions of theory and climate modeling. His caption explains the chart:



*Figure 5. Simplification of an IPCC AR5 Figure 4. The colored lines represent the range of results for the **models and observations.** **The key point displayed is the lack of overlap between the GHG model results (red) and the observations (gray). The non-GHG model runs (blue) overlap the observations almost completely**.*

Christy Testimony, p. 9. The trend of the predictions of the models *with GHGs*

differs from the trend of the observations at the 99% confidence level. *Id*.

Dr. Christy explained the significance in his prepared testimony:

What is immediately evident [from Fig. 5] is that the **model trends in which extra GHGs are included lie completely outside of the range of the observational trends**, indicating again that **the models, as hypotheses, failed a simple "scientific-method" test applied to this fundamental, climate-change variable**. … Incredibly, what Fig. 5 shows is that the bulk tropical atmospheric temperature **change is**

24

**modeled best when no extra GHGs are included – a direct contradiction to the IPCC conclusion that observed changes could only be modeled if extra GHGs were included**.

*Id*. p. 9-10. (Emphasis added).

The TSD explicitly stated "[t]he observed warming *can only be reproduced with models that contain **both** natural and anthropogenic forcings*." TSD. P. 49. (Emphasis added). ***In fact, the exact opposite is true –only models <u>without</u> human emissions matched observations***. Models unequivocally fail the explicitly stated criteria for their use in attribution.

Wallace (April 2017) also found that adjusting for just the natural factors, none of the nine tropical temperature time series analyzed were consistent with the EPA's Tropical Hot Spot theory. That is, adjusting for just the effects of natural factors over their entire history, all nine of tropical temperature data analyzed have non-statistically significant trend slopes—which invalidates the Tropical Hot Spot theory.

$CO_2$ did not have a statistically significant impact on any of these temperature data sets. This invalidates the Tropical Hot Spot theory and two of the three lines of evidence in EPA's Endangerment Finding.

Wallace (2016), Wallace (April 2017) and Wallace (2018) each show that the THS does not exist in more than 50 years of balloon and 37 years of satellite temperature data generated by five independent entities. This constitutes a

25

fundamental failure of the physical understanding of GHG's impact on climate and of the climate modeling enterprise.

In sum, no claim of attribution can survive (1) proof that the global average surface temperature record is substantially fabricated (2) the comprehensive invalidation of the Tropical Hot Spot theory by observations (in this case, by proper mathematical analysis of the most credible, relevant tropical temperature data), and (3) the abject failure of climate models to meet the explicitly stated criteria for their use in attribution.

## SUMMARY OF ARGUMENT

In the Endangerment Finding EPA explicitly based its attribution analysis on what it called "three lines of evidence," temperature records, physical understanding of climate, and modeling. The Petitions presented new data and analysis that invalidate these three lines of evidence and EPA's attribution of global warming to human emissions of GHG.

There is no credible temperature data for well over 40% of the earth prior to the year 2000. Temperature records began to be collected in the middle of the 19th Century, but only in a small portion of the globe. In the Southern Hemisphere 80% plus of the surface is ocean, and across this vast expanse there are no data before 2000. The records from Southern Hemisphere land stations exist but are from just a handful of stations compared to dense networks of temperature stations in the US

26

and Western Europe. For these vast regions and lengthy periods for which there are no data, temperature data was simply fabricated. In short, it was not possible to construct a credible 100 plus year record of Global Average Surface Temperature (GAST). A house of cards was built on the credibility of the GAST data published by NOAA and NASA.

Proof of obvious GAST data fabrication invalidates not just the temperature records line of evidence, but also the physical understanding of climate and climate models, because their validity depends upon and requires valid and reliable temperature records with adequate coverage in time and space to correctly and completely characterize the natural variability of the climate system. This is a very simple point that requires no scientific or mathematical expertise to understand.

EPA's Denial of the Petitions mischaracterizes the evidence and analysis presented by Petitioners on the fabrication of surface temperature data and fails to answer the substance of a point of central relevance to the Endangerment Finding.

Petitioners also presented new evidence and analyses that conclusively invalidate the other two lines of evidence, the purported physical understanding of climate and climate models. The claimed physical understanding of climate, which is embedded in climate models, predicts a distinctive pattern of warming in the tropical troposphere, referred to as the Tropical Hot Spot. As predicted by this physical understanding or theory and depicted in models, due to increasing

27

atmospheric $CO_2$ concentration, the *rate* of warming should increase with altitude in the tropics. That is, the rate of warming at the surface in the tropics will be exceeded by the rate of warming in the middle troposphere, which will be exceeded again by the warming in the upper troposphere. This prediction is invalidated by statistical analyses of credible empirical data provided in the Petition. The invalidations of the predictions of the theory and models shows that climate models fail to meet the criteria for their use in attribution, criteria explicitly set forth in foundational reports from the National Academy of Sciences, the IPCC, and the U.S. GCRP and even the Technical Support Document for the Endangerment Finding.

EPA's Denial is arbitrary and capricious because it mischaracterizes and avoids the substance of the Petitions' evidence invalidating the three lines of evidence. Thus, even when reviewed with "extreme deference," EPA's Denial is arbitrary and capricious and should be vacated.

The extreme deference standard is not required by statute. To the contrary, it is a judge-made rule. Under this standard, extremely consequential policies are imposed by the permanent administrative state with minimal scrutiny if they can be packaged as "scientific determinations." For extremely consequential determinations, this is backwards. Such policies should be set by Congress, not by

28

imposed by regulatory thunderbolts from an Administrator on high, immune as a practical matter from meaningful review and lacking any legislative benediction.

Before giving the administrative state regulatory authority over emissions that are both ubiquitous and *indispensable* to modern civilization, something more than extreme deference is required, lest President Eisenhower's warning against domination by a federally-funded scientific-technological elite come to pass. *See* n. 2, above.

Petitioner FAIR Energy Foundation ("FEF") contended in its Petition that *Massachusetts v. EPA* incorrectly ceded to EPA a question the Constitution requires be decided by the legislative branch. If *Massachusetts v. EPA* were decided for the first time under the major questions doctrine as explained in *West Virginia v. EPA*, it would have been decided differently. Congress did not intend to hide so elephantine a grant of authority in the mousehole of a definition of "air pollutant" that is so elastic as to lack meaning, and so unworkable in practice that just seven years after *Massachusetts* it was given directly opposite meanings in different parts of the Clean Air Act to prevent the Act from collapsing on itself. *See Utility Air Regulatory Group v. EPA*, 573 U.S. 302 (2014).

Two major GHG emissions regulations under the Clean Air Act have been invalidated under the major questions doctrine. The source of this recidivist regulatory overreach is the decision in *Massachusetts v. EPA* and the

29

Endangerment Finding. The problem avoided by interpretive gymnastics in *Utility Air Regulatory Group v. EPA*, 573 U.S. 302 (2014) should be addressed head-on under the major questions doctrine.

## STANDING

Denial of CHECC's Petition for Reconsideration of EPA's Endangerment Finding and its supplements (the "Petition"), harms CHECC and its members because GHG regulation flowing from the Endangerment Finding increases the costs of fossil fuels and of electricity that they have to pay.

Each of CHECC's members is a U.S. citizen and a member of a household that pays electricity bills. EPA's regulations based on the Endangerment Finding drive replacement of fossil-fuel-generated electricity with "renewables," principally wind turbines and solar panels. Replacement of fossil fuel sources with such renewables, that provide power only intermittently, will increase the cost of electricity paid by the Petitioners. As a result of the Denial of their Petition, each of the Petitioners will pay higher electricity bills.

Experience proves the point. In 2020 California got a total of 24.36% of its electricity from wind and solar. *See 2021 Total System Electric Generation*, available at https://www.energy.ca.gov/data-reports/energy-almanac/california-electricity-data/2020-total-system-electric-generation.[10] California's average

---

[10] Last visited Oct. 14, 2022.

electricity rate in 2020 was 18.48 cents per kWh, up from 15.62 cents per kWh in 2015, when renewables penetration was lower. The U.S. average is 10.93 cents per kWh. *See Electric Power Monthly*, *Table 5.6.A. Average Price of Electricity to Ultimate Customers by End-Use Sector*, available at

https://www.eia.gov/electricity/monthly/epm_table_grapher.cfm?t=epmt_5_6_a.[11]

In Europe, Germany began converting to renewables in 2010, and by 2015 30% of its electricity was from wind and solar. *See Germany's renewables electricity generation grows in 2015, but coal still dominant,* (May 24, 2016) available at http://www.eia.gov/todayinenergy/detail.php?id=26372.[12] The average German household's electricity rate in 2021 was 32.16 cents per kWh, about *triple* the average U.S. rate. *See Clean Energy Wire: What German households pay for power,* available at https://www.cleanenergywire.org/factsheets/what-german-households-pay-power.[13]

Using batteries to solve intermittency is economically and practically infeasible given their cost and limited availability relative to the requirement. Therefore, equivalent dispatchable fossil-fuel-fired capacity must be kept in reserve. This necessarily means (1) utilities have a much higher capital investment to supply the same demand, (2) substantial portions of that capacity will be idle

---

[11] Last visited Oct. 14, 2022.
[12] Last visited Oct. 14, 2022).
[13] Last visited Oct. 14, 2022.

and not producing revenue, and (3) the increased costs must all be recovered from the same base of rate payers. Dramatic electricity price increases are therefore an inevitable consequence of increased reliance on wind and solar power.

CHECC's Petition presents substantial evidence on the lack of scientific merit of the Endangerment Finding and of data fraud in the surface temperature record invaliding all three lines of evidence on which attribution in the Endangerment Finding is based. CHECC contends that EPA failed to exercise and document reasoned "judgment" as required by the Clean Air Act in denying its Petition for Reconsideration. Further, EPA has itself deliberately misrepresented and excluded scientific information contrary to its predetermined position and has misrepresented the substance of the Petition.

FAIR Energy Foundation ("FEF") is a 501(c)(3) non-profit promoting international competitive energy, free markets, energy abundance, prosperity and human flourishing.

FEF contends and seeks to educate policy makers and the public that abundant energy is the core driver of global prosperity and that free-market energy policies and energy abundance will produce prosperity, security and human flourishing around the world, and that these goals are threatened by unwarranted regulation of GHG emissions as a direct result of the Endangerment Finding.

32

Denial of FEF's Petition for Reconsideration harms FEF because GHG regulation flowing from the Endangerment Finding necessarily limits the availability and exploitation of fossil fuels and thereby jeopardizes the prosperity, security and human flourishing that it is FEF's purpose to promote. Similarly, for the reasons stated above, GHG regulations increase the cost of electricity, which also frustrates FEF's goal of energy abundance, economic security, national security and human flourishing.

In view of their missions, CHECC and FEF have legitimate interests in overcoming governmental tampering with and misrepresentation of available scientific information, and governmental abuse of the processes for evaluation of scientific information that are mandated by the Clean Air Act. *See Scientists' Institute for Public Information v. Atomic Energy Commission*, 481 F.2d 1079, 1086 n.29 (D.C. Cir. 1973) (noting that "Any other approach to standing in the context of suits to ensure compliance … for long-range Government programs not yet resulting in injury to discrete economic, aesthetic, or environmental interests would insulate administrative action from judicial review, prevent the public interest from being protected through the judicial process, and frustrate the policies Congress expressed …, a result clearly inconsistent with the Supreme Court's approach to standing.").

33

Both Petitions also sought a rulemaking proceeding to reconsider the Endangerment Finding under 5 U.S.C § 553(e) of the Administrative Procedures Act. The Denial of their Petitions gives them standing under *Massachusetts v. EPA*, 549 U.S. at 520 ("Congress has moreover recognized a concomitant procedural right to challenge the rejection of its rule-making petition as arbitrary and capricious. § 7607(b)(1)."); *PPG Indus., Inc. v. Costle*, 659 F.2d at 1250.

The injuries to both Petitioners are redressable by reconsidering and repealing the Endangerment Finding and thereby eliminating the legal cause of GHG regulation and the regulatory impositions that increase the price of electricity by requiring ever greater reliance on intermittent renewables, increase the cost of energy by limiting the supply, transportation, refining and consumption of fossil fuels, and increase the cost of agricultural inputs, driving up the cost of food and nearly all goods and services. Meanwhile, the forced use of renewables has already led to reduced power grid resilience and reliability which, if not remedied, has dangerous long term national security implications.

## ARGUMENT

### I.  THE DENIAL OF THE PETITIONS FOR RECONSIDERATION WAS ARBITRARY AND CAPRICIOUS

This section of the argument is reviewed under the "extreme deference" standard of review. *Coal. for Responsible Regul., Inc. v. E.P.A.*, 684 F.3d 102, 120 (D.C. Cir. 2012), *aff'd in part, rev'd in part sub nom. Util. Air Regul. Grp. v. E.P.A.*,

573 U.S. 302, (2014), and *amended sub nom. Coal. for Responsible Regul., Inc. v. Env't Prot. Agency*, 606 F. App'x 6 (D.C. Cir. 2015). Petitioners argue for a different standard of review in Section II.

A.    INTRODUCTION

EPA's Endangerment Finding, that observed warming has been caused by human GHG emissions, is explicitly premised on what it refers to as "three lines of evidence," temperature records, the physical understanding of climate, and climate models. The Petitions showed new evidence and analysis that all three of these lines of evidence are invalid, and that the attribution of any warming and increased extreme weather events to human emissions is therefore also invalid. Absent valid attribution, there is no rational basis for regulation.

B.    EPA'S DEFENSE OF ATTRIBUTION IN REJECTING THE PETITIONS IS ARBITRARY AND CAPRICIOUS.

At p. 16 of its Denial, EPA attempts to put Humpty Dumpty back together again. It defends its attribution analysis by minimizing the importance of the three lines of evidence, saying "[w]hile attribution of historical warming to elevated concentrations of GHGs is important, the Agency never characterized these three lines of evidence as the 'basis' for the 2009 Endangerment Finding." EPA is here attempting to rewrite history. The Endangerment Finding irrevocably binds the Agency to the position that "*attribution* of observed climate change to

35

anthropogenic activities is based on" the three lines of evidence. *See* quotation at p. 8, above. (Emphasis added). It is indisputable that the three lines of evidence are the basis of EPA's *attribution*. Attribution *is* causation. Without causation, human emissions are irrelevant, endanger nothing and no one, and cannot be regulated under the Clean Air Act.

Further attempting to evade its prior explicit reliance on the three lines of evidence, EPA claims that "the Administrator considered the entirety of the evidence regarding both historical and projected climate change, not just the three lines of evidence regarding attribution." *Id*., p. 16. This implies there is a difference between "historical and projected climate change" on the one hand and "the three lines of evidence regarding attribution" on the other. Here one must watch the pea. EPA says it considered the "evidence regarding both historical and projected climate change" *in addition to* temperature records and modeling. But the "evidence regarding … historical climate change" *is* temperature records, while the "evidence regarding … projected climate change" *is* modeling. EPA is thus contending that it did not just consider temperature records and modeling, but also temperature records and modeling. Such self-contradictory nonsense is arbitrary, capricious and irrational under even the most permissive standard of review.

EPA continues: "Thus, even in the absence of definite historical attribution, there is independent scientific evidence regarding projected climate impacts that

36

also supports the finding of endangerment." *Id*. In plainer terms, EPA is saying

endangerment is supported by an independent evidentiary base, namely modeling.

But modeling can *never* be an evidentiary base that is independent of the other two

lines of evidence, physical understanding of climate (i.e., the THS theory) and

temperature records (i.e., GAST data). *First*, the physical understanding of climate,

such as it is, is derived from temperature records and is expressed in the models.

Models are thus the digital incarnation of the first two lines of evidence. *Second*,

models are initialized from and tuned to fit temperature records. AR5 § 9.2.1.4,

Chapter 9, p. 754. *Third*, the only way to test the validity of the models is by

comparing their predictions to observations–temperature records. As shown above,

models containing the key feature of global warming theory, the Tropical Hot Spot,

fail the test of comparison with actual empirical data, and thus the models fail the

explicitly stated criteria for their use in attribution. EPA's suggestion that climate

models are an independent and by themselves sufficient evidentiary basis upon

which to attribute warming to human emissions is patently illogical.

Petitioners are not nit picking around the margins, they are instead going for

the jugular. Attribution supplies the causal link between human emissions and

global warming and the parade of horribles constituting the "danger" of

endangerment. Without proof of attribution there is no proof of causation, no

problem caused by human emissions, and no legal authority to regulate GHGs.

37

Attribution is inescapably the very heart and essence of the matter—no scientific or evidentiary question could be more important. Much more than the evasions, nonsense and doubletalk reviewed above are required to overcome the compound defects in the three lines of evidence and the attribution analysis pointed out by Petitioners, even under the extreme deference standard of review.

C.    EPA's Critique of Wallace 2016, April 2017 and 2018 is Arbitrary and Capricious.

The EPA's Denial criticizes the Wallace 2016 econometric and statistical analysis on the grounds that it does not attempt to explicitly represent the physical processes of climate. Denial, p. 19. The excerpt from Dr. Christy's prepared testimony above at p. 16 explains why this is not a valid criticism. The temperature data analyzed is the empirical measurement of the output of *all* climate processes, not just those known and crudely represented in the climate models—many of which are notoriously intractable to modeling—but also all others not yet understood or even known. The statistical approach sidesteps the shortcomings of models.

It should be noted here that EPA in its Denial actually failed to address much less challenge at all Wallace April (2017), cited in the Seventh Supplement. In the Preface of this report, the structural analysis methodology used therein was thoroughly and rigorously documented. EPA was required to consider and respond

38

to the merits of the methods explained in the Preface. But EPA said nothing. Recognizing that reproducibility is key to credibility, the Preface also made it clear to readers how they could personally reproduce all of the statistical results presented in the report.

EPA also contends that the peer review for the 2016, 2017 and 2018 Wallace reports does not qualify as peer review. But there is no basis for this contention. Wallace (2016), Wallace (Apr. 2017) and Wallace (Jun. 2017) all have seven identified peer reviewers. The quality of the peer reviewers listed in each report speaks for itself.

Moreover, there is a copious body of scientific literature demonstrating the large-scale failure of peer review. *See*, e.g., J. Ioannidis, *Why most published research findings are false*, PLOS MED. (Aug. 2, 2005, p. 8), available at https://pubmed.ncbi.nlm.nih.gov/16060722/ (last visited Oct. 13, 2022); Smith, R., *Peer Review: a flawed process at the heart of science and journals*, JOURNAL OF THE ROYAL SOCIETY OF MEDICINE, Apr. 2006, Vol. 99(4) pp. 178-182, *available at* https://tinyurl.com/yc6zzafm (last visited Oct. 13, 2022); Ferguson, et al, *Publishing: The peer-review scam*, NATURE, Vol. 515, pp. 4800481 (2014) (available at https://www.nature.com/articles/515480a, last visited Oct. 13, 2022). There are many such articles.

In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150-151 (1999), the Supreme Court declined to make a fetish of the reference to peer review in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.,* 509 U. S. 579 (1993) in establishing the admissibility of expert testimony.

EPA's criticism of the peer review of the Wallace papers rests on assumptions about more traditional peer review that are invalidated by its well-documented infirmities and corruption. It also slights the outstanding qualifications of the seven peer reviewers who by name endorsed the Wallace papers' methods and conclusions. It is the substance that counts, not whether the was approved by a flawed system of validation that is mainly a vehicle for academic log-rolling or is manipulated to enforce orthodoxy.

EPA's critique that the statistical analysis utilized in the Wallace reports fails to represent the physics of climate was answered by Dr. Christy's explanation in his Congressional testimony quoted above at p. 16 that the statistical analysis of temperature records implicitly includes *all* of the physical processes, including the ones that are not known or understood, and those that are intractable to modeling, at least today.

EPA clings to its position even though the predictions of its theories have been invalidated by observations. EPA's position is arbitrary and capricious when

40

considered against Feynman's explanation of the "key to science," quoted at p. 10, above.

### D.    EPA's Analysis of Petitioners' Extreme Events Evidence is Arbitrary and Capricious.

The Endangerment Finding repeatedly asserts that public health is endangered by increased frequency and severity of extreme weather events caused by human GHG emissions:

> In these Findings, the term ''climate change'' generally refers to the global warming effect plus other associated changes (e.g., precipitation effects, sea level rise, *changes in the frequency and severity of extreme weather events) being induced by human activities*, including activities that emit greenhouse gases.

74 Fed. Reg. 66499:2. (Emphasis added). "The evidence concerning how human-induced climate change may alter extreme weather events also clearly supports a finding of endangerment … ." *Id*. at 66497:3. An entire subheading of the Endangerment Finding, Section IV(B)(1)(c), is devoted to explaining that the "Effects on Extreme Weather Events" "Endanger Public Health." *Id*. at 66525:2. There is simply no question but that EPA grounded the 2009 Endangerment Findings on the position that GHG emissions cause increased frequency and severity of extreme weather events.

CHECC's Fifth Supplement explained that if causal chain between human GHG emissions and global warming were broken, then it would also necessarily break the causal chain between human emissions and any increase in the frequency

or severity of extreme events associated with assumed warming. *See* Fifth Supplement, pp. 2-3.

The Fifth Supplement then showed, based on the most relevant and credible empirical data, that there had been no increasing trend in ten separate categories of extreme events, including all of those cited by EPA. EPA's claim that human emissions of GHGs are causing more frequent and severe extreme events is clearly false. Thus, any reliance by EPA on claims of increasing frequency or severity of extreme events in the 2009 Endangerment Finding or any later Endangerment Findings is groundless, arbitrary and capricious.

EPA's response to these points is worthy of careful analysis. EPA begins by noting CHECC's contention that empirical data "invalidates oft-repeated alarmist claims that human emissions of GHGs will cause calamitous changes in other state variables of the climate system such as sea level rise, ocean acidification and extreme events," Denial, p. 27. EPA then contends that "CHECC does not connect these claims to language in the 2009 Endangerment Finding, or, indeed, in any of the scientific assessment literature that was cited in that finding." *Id*., p. 28. In fact, however, the Fifth Supplement did exactly that, as the following passage from that document clearly shows:

> If the causal link between higher atmospheric CO2 concentrations and higher global average surface temperature ("GAST") is broken by invalidating each of EPA's three lines of evidence, then EPA's assertions that higher CO2 concentrations also cause loss of Arctic ice[1],

42

sea-level increases[2] and more frequent severe temperatures,[3] storms,[4] floods,[5] and droughts[6] are also necessarily disproved.

Fifth Supplement, pp. 2-3. The footnotes to this passage, reproduced below, all give exact quotations and supporting pinpoint citations to the TSD, where EPA actually made these particular claims:

> [1] Technical Support Document for Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act ("TSD"), pp. ES-4 ("Sea ice extent is projected to shrink in the Arctic under all IPCC emissions scenarios") *See also id*. at pp. 52; 73.

> [2] *Id*. at p. ES-4 ("By the end of the century, global average sea level is projected by IPCC to rise between 7.1 and 23 inches."); *See also id*. at 52, 73.

> [3] *Id*. at pp. ES-4 ("It is very likely that heat waves will become more intense, more frequent, and longer lasting in a future warm climate, whereas cold episodes are projected to decrease significantly."); *See also id*. at pp. 44-45; 73-74.

> [4] *Id*. at ES-4 ("It is likely that hurricanes will become more intense").

> [5] *Id*. at ES-4 ("Intensity of precipitation events is projected to increase in the United States and other regions of the world. More intense precipitation is expected to increase the risk of flooding.")

> [6] *Id*. at p. ES-6 (Reduced snowpack, earlier spring snowmelt, and increased likelihood of seasonal summer droughts are projected in the Northeast, Northwest, and Alaska. More severe, sustained droughts and water scarcity are projected in the Southeast, Great Plains, and Southwest."); 45-46; 73-74.

Fifth Supplement, pp. 2-3. In other words, EPA's claim that the Fifth Supplement did "not connect these claims to language in the 2009 Endangerment Finding, or, indeed, in any of the scientific assessment literature that was cited in that finding"

43

is just flat-out not true.

From this ignominious beginning, EPA then says the Fifth Supplement's empirical data showing no positive trend in ten categories of extreme events is "not relevant," because one of the ten relates to tornadoes, while EPA barely mentioned tornadoes. Denial, p. 28. The careful reader will note that CHECC did not contend that EPA made any claims about tornadoes. CHECC instead listed six categories of extreme events that EPA *did* claim in the TSD would be made worse by human GHG emissions; tornadoes were not one of them. The Fifth Supplement presented empirical data on all six of the categories EPA *did claim* would be made worse, *plus four more*. One of these additional four *was* tornadoes. EPA says literally *nothing* about the empirical data proving that its claim that six categories of extreme events would be made worse by human emissions is simply not true (loss of arctic sea ice, sea level rise, severe temperatures, storms, floods and droughts).

Here again Petitioners are not picking at the margins. The alleged increasing frequency and severity of extreme weather events has "central relevance" to the Endangerment Finding—they are embedded in its definition of "climate change." CHECC's proof that there has been no increase in the frequency or severity of extreme events—which EPA evades rather than disputes—exposes a complete failure of at least one if not both links in EPA's causal chain between human GHG emissions and extreme events. Either human emissions are not causing global

44

warming, breaking the chain at the first link as Petitioners contend, or warming does not cause increased frequency or severity of extreme events. In either event, the Endangerment Finding's reliance on increasing frequency and severity of extreme weather events lies in ruins and should be reconsidered.

EPA's treatment of this issue is a shockingly disingenuous tissue of prevarications and evasions. As such, it is arbitrary, capricious, and fails to meet the requirement of reasoned decision making. The Denial should be vacated with direction to honestly address the clear evidence that its claims that the frequency or severity of extreme weather events is increasing as a result of GHG emissions are false.

## II.    THE EXTREME DEFERENCE STANDARD FOR AGENCY SCIENTIFIC DETERMINATIONS IS TOO PERMISSIVE FOR DECISIONS AS MOMENTOUS AS RECONSIDERATION OF THE ENDANGERMENT FINDING.

This issue is reviewed de novo as it concerns a question of law, the standard of review to be applied by this Court, which is. *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 572 U.S. 559, 563 (2014).

The preceding argument has challenged the Denial under the extreme deference standard of review. In this section, Petitioners contend a higher level of scrutiny should be applied. The Endangerment Finding is the most consequential agency scientific determination in the history of the American administrative state.

45

Denying reconsideration in the face of the evidence invalidating the Endangerment Finding is also momentous.

In *Coal. for Responsible Regul., Inc. v. E.P.A*., 684 F.3d 102, 120 (D.C. Cir. 2012), this Court applied "an extreme degree of deference to the agency when it is evaluating scientific data within its technical expertise."

Extreme deference is a judge-made rule not required by any statute. The statutory arbitrary and capricious standard of review, 42 U.S.C. § 7607, requires agencies to make their decisions "based on a consideration of the relevant factors" and "without a clear error of judgment. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). An extreme deference standard of review is too lax to enforce reasoned decision making as required by the statute.

Professor Emily Meazell, in her article *Super Deference, The Science Obsession, and Judicial Review as Translation of Agency Science*, 109 MICHIGAN L. REV. 733 (2011), observed that agencies are encouraged to avoid accountability by the extreme deference standard of review, and that it is inadequate to enforce the statutory requirement of reasoned decision-making. "[A] highly deferential approach to scientific and technical determinations incentivizes agencies to cloak their true reasoning behind an unassailable mantle of science," *Id*. at 763-764 and 752, and risks missing "the failures of reasoned decision-making Congress have entrusted the courts with identifying." *Id*. at 749-750.

In *March v. Oregon Natural Resources Council*, 490 U.S. 360, 378 (1989), a decision after *Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87 (1983), the ostensible font of super deference, the Supreme Court cited the *Baltimore Gas* standard but actually applied sufficient scrutiny to enforce the requirement of reasoned decision making:

> [C]ourts should not automatically defer to the agency's express reliance on an interest in finality without carefully reviewing the record and satisfying themselves that the agency has made a reasoned decision based on its evaluation of the significance -- or lack of significance -- of the new information. A contrary approach would not simply render judicial review generally meaningless, but would be contrary to the demand that courts ensure that agency decisions are founded on a reasoned evaluation "of the relevant factors."

*March*, 490 U.S. at, 378 (1989).

In this case it is not difficult to understand the invalidity of the attribution analysis or the three lines of evidence upon which it rests. Nor is it difficult to grasp that EPA relies on nonsense and doubletalk to run away from the problems with its attribution analysis. Nor is it hard to understand the evasive nature of EPA's response to the comprehensive empirical refutation of its false claims about extreme weather events. There is no reason in law or policy for a federal appellate judge to show extreme deference to jabberwocky. EPA's Denial is arbitrary and capricious and fails to meet the standard of reasoned decision making.

Generalist judges have ample qualifications for the task at hand in this case. They have experience and expertise in applying logic to facts. They excel, above

47

virtually any other profession, in distinguishing between meritorious and fallacious

logical arguments. Federal appellate opinions are often very complex. Judges are

*not* disqualified from evaluating problems of logic merely because they come

dressed in scientific garb, or when they are not science but instead political

decisions in scientific drag. Einstein once said that scientific inquiry is "nothing

but a refinement of our everyday thinking," Einstein, A., *Physics and reality*,

DAEDALUS, Fall, 2003, Vol. 132, No. 4, *On Science* (Fall, 2003), pp. 22-25,

available at https://tinyurl.com/yckpcjmb (last visited Oct. 13, 2022). Professor

Susan Haack, in her article *Trial and Error: The Supreme Court's Philosophy of

Science*, AMERICAN JOURNAL OF PUBLIC HEALTH (July 2005), available at

https://tinyurl.com/mxjh5m9w (last visited Oct. 13, 2002), describes the

commonality between ordinary inquiry and science as follows:

> *Every* kind of empirical inquiry, from the simplest everyday puzzling
> over the causes of delayed buses or spoiled food to the most complex
> investigations of detectives, of historians, of legal and literary scholars,
> and of scientists, involves making an informed guess about the
> explanation of some event or phenomenon, figuring out the
> consequences of its being true, and checking how well those
> consequences stand up to evidence. This is the procedure of all
> scientists; but it is not the procedure *only* of scientists.

(Emphasis in original).

Feynman made a similar point as follows: "It should not be 'science has

shown' but 'this experiment, this effect, has shown.' **And you have as much right

as anyone else, upon hearing about the experiments–but be patient and listen**

48

**to all the evidence–to judge whether a sensible conclusion has been arrived**

**at**." Richard Feynman, *What is Science*? available at

http://www.feynman.com/science/what-is-science/ (last visited Oct. 13, 2022).

(Emphasis added).

Thus, merely labeling an issue as a "scientific question" does not necessarily

put it beyond the reach of judicial discernment. Where an agency "scientific"

determination is shown by empirical evidence to be patently illogical on easily

comprehensible grounds, a court should not hesitate to say so. This is especially

true, where, as here, the purportedly "scientific" determinations exemplify the

"science charade" and are more politics than science.

GHG regulation, especially of $CO_2$ and Methane, is uniquely consequential

given the ubiquitous and practically miraculous benefits to humanity of fossil fuels

and the catastrophically adverse effects on energy security, economic security, food

security and national security of attempting to decarbonize.

A mixed scientific and policy determination carrying the immense

consequences of the Endangerment Finding should be evaluated at a higher

standard of review than "extreme deference" to make sure that EPA is not

colonizing a major policy question that by Constitutional design must be left to

Congress. While the major questions doctrine as enunciated in *West Virginia v.*

*EPA*, (2022) is not directly applicable to agency scientific determinations, it

nevertheless counsels that where an agency claims authority to regulate something as ubiquitous as $CO_2$ emissions, courts should exercise special vigilance to make sure that the agency's action is grounded in a clear statutory statement granting that authority. EPA's arbitrary and capricious denial of the Petitions, viewed in light of the extreme breadth and scope of regulatory authority claimed by EPA (and all of government) through the Endangerment Finding, and the extreme and revolutionary consequences to society of attempting to manage climate through administrative regulation of GHG emissions, should require a hard look rather than extreme deference.

### III.   *MASSACHUSETTS V. EPA* SHOULD BE REVISITED IN LIGHT OF THE MAJOR QUESTIONS DOCTRINE.

This section presents an issue under the major questions doctrine and is reviewed under the standards set forth in *West Virginia v. EPA,* ___ U.S. ___, 142 S.Ct. 2587 (2022).

While this Court cannot overrule the Supreme Court, Petitioners must present the argument that *Massachusetts v. EPA* should be revisited under the major questions doctrine to preserve the issue for possible consideration by the Supreme Court.

The Petition of FEF contended at p. 20 that Congress had never adopted any legislation authorizing EPA to regulate $CO_2$ or other GHGs, and that "[u]nder our

Constitution and system of government, Congress has the power to legislate, expressing the will of the people." The Petition further contends that the decision in *Massachusetts v. EPA*, 549 U.S. 497 (2007) that $CO_2$ and other GHGs were "air pollutants" for purposes of the Clean Air Act infringed on Congress' authority to legislate on the question, and that the case was wrongly decided.

The majority in *Massachusetts v. EPA* held that GHGs "fit well within the Clean Air Act's capacious definition of 'air pollutant,'" and "that EPA has the statutory authority to regulate the emission of such gases from new motor vehicles." 549 U.S. at 532. The Act-wide definition of "air pollutant" construed in *Massachusetts v. EPA* is "'any air pollution agent or combination of such agents, including any physical, chemical, biological, radioactive ... substance or matter which is emitted into or otherwise enters the ambient air.' [42 U.S.C.] § 7602(g)." 549 U.S. at 506. The Court rejected arguments that this language was too vague to constitute a grant of regulatory authority over GHGs as follows:

> While the Congresses that drafted § 202(a)(1) *might not have appreciated the possibility that burning fossil fuels could lead to global warming,* they did understand that without regulatory flexibility, changing circumstances and scientific developments would soon render the Clean Air Act obsolete. The broad language of § 202(a)(1) reflects an intentional effort to confer the flexibility necessary to forestall such obsolescence. See *Pennsylvania Dept. of Corrections v. Yeskey*, 524 U.S. 206, 212, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998) ("[T]he fact that a statute can be applied in situations *not expressly anticipated by Congress* does not demonstrate ambiguity. It demonstrates breadth" (internal quotation marks omitted)). Because greenhouse gases fit well within the Clean Air Act's capacious definition of "air pollutant," we hold that EPA

51

has the statutory authority to regulate the emission of such gases from new motor vehicles.

549 U.S. at 533. (Emphasis added). In dissent, Justice Scalia argued that the majority did not consider the entire statutory definition, which required an "air pollutant" to be "any air pollution agent or combination of such agents," which, he argued, would tether the meaning of "air pollutant" to "some substance that is *polluting* the *air*." *Id*. at 559 (emphasis in original). The majority's reading of the statute, he argued, made "air pollutant" so broad as to lack any intelligible meaning:

> As the Court correctly points out, "all airborne compounds of whatever stripe," *ante,* at 1460, would qualify as "physical, chemical, ... substance[s] or matter which [are] emitted into or otherwise ente[r] the ambient air," 42 U.S.C. § 7602(g). It follows that *everything* airborne, from Frisbees to flatulence, qualifies as an "air pollutant." This reading of the statute defies common sense.

*Id*. at 558, n. 2 (emphasis in original).

These contrasting analyses take on an entirely different meaning when viewed in the light cast by the major questions doctrine articulated in *West Virginia v. EPA,* ___ U.S. ___, 142 S.Ct. 2587 (2022)*.* In that case, the Court gave the doctrine its clearest expression. At the highest level of generality, the question is "whether Congress in fact meant to confer the power the agency has asserted." *Id*. at 2608. There are certain "extraordinary cases" in which "'the history and breadth of the authority that [the agency] has asserted,' 'and the economic and political

significance' of that assertion, provide a 'reason to hesitate before concluding that Congress' meant to confer such authority." *Id*. at 2595, *citing FDA v. Brown & Williamson Tobacco Corp*., 529 U.S. 120, 159–160 (2000).

In *Brown and Williamson*, the Court rejected the "expansive construction of the statute" advocated by the agency, holding "'Congress could not have intended to delegate' such a sweeping and consequential authority in 'so cryptic a fashion.'" 529 U.S. at 160.

In *Whitman v. American Trucking Assns., Inc*., 531 U.S. 457, 468 (2001) the Court explained that agencies may not seek to hide "elephants in mouseholes."

In *Alabama Assn. of Realtors v. Department of Health and Human Servs*., 594 U. S. ___, ___, 141 S.Ct. 2485, 2487 (2021) the Court held that the authority of the Centers for Disease Control to "prevent the spread of disease" gave it no power to order a nationwide eviction moratorium in response to the COVID–19 pandemic, especially in light of the "sheer scope" and unprecedented nature of the authority claimed.

And in *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014), the Court held that the term "air pollutant"—the exact term at issue in *Massachusetts v. EPA*, albeit in a different code section—could not be construed to include GHGs because, as described in *West Virginia v. EPA*, it "would have given it permitting authority over millions of small sources, such as hotels and office buildings, that

53

had never before been subject to such requirements." *West Virginia v. EPA*, 142

S.Ct. at 2608, citing *Utility Air*, 573 U.S. at 310, 324. The Court "declined to

uphold EPA's claim of 'unheralded' regulatory power over 'a significant portion of

the American economy.'" *Id.*

Summarizing, the Court in *West Virginia v. EPA* said:

> Thus, in certain extraordinary cases, both separation of powers principles
> and a practical understanding of legislative intent make us "reluctant to
> read into ambiguous statutory text" the delegation claimed to be lurking
> there. *Utility Air*, 573 U.S. at 324, 134 S.Ct. 2427. To convince us
> otherwise, something more than a merely plausible textual basis for the
> agency action is necessary. The agency instead must point to "clear
> congressional authorization" for the power it claims. *Ibid.*

42 S.Ct. at 2609. Applying these principles, the Court held that EPA's Clean Power

Plan was a major questions case:

> This is a major questions case. EPA claimed to discover an unheralded
> power representing a transformative expansion of its regulatory authority
> in the vague language of a long-extant, but rarely used, statute designed
> as a gap filler. That discovery allowed it to adopt a regulatory program
> that Congress had conspicuously declined to enact itself. Given these
> circumstances, there is every reason to "hesitate before concluding that
> Congress" meant to confer on EPA the authority it claims under Section
> 111(d).

*Id.* at 2595.

The Court in *West Virginia v. EPA* then rejected EPA's claim that Section

111(d) of the Clean Air Act gave it broad and unprecedented authority over the

electric power generation sector of the economy as not being supported by a clear

statement in the statute.

The Court in *Utility Air* noted that "[i]n response to [*Massachusetts v. EPA*], EPA embarked on a course of regulation resulting in 'the single largest expansion in the scope of the [Act] in its history.' Clean Air Act Handbook, at xxi." 573 U.S. at 309. *Utility Air* applied the major questions doctrine to trim those ambitions, and invalidate the so-called Triggering Rule. It held that the definition of "air pollutant" in the PSD and Title V programs did not include GHGs because doing so would be irrational in those specific statutory contexts. Rather than apply the major questions doctrine directly to overrule *Massachusetts v. EPA*, the Court instead held that the definition "air pollutant" in other contexts in the Clean Air Act could be interpreted to exclude GHGs to avoid irrational and sweeping claims to unprecedented regulatory authority that were not clearly granted by the statute.

*Utility Air* thus limited rather than overruled *Massachusetts v. EPA's* interpretation of the Act-wide definition of "air pollutant." But this leaves us with an Act in which the exact same words have vastly different meanings depending on where in the statute they appear. In some places "air pollutant" includes GHGs, and in several others it does not. Thus, *Utility Air* wryly observed that "Congress's profligate use of 'air pollutant' where what is meant is obviously narrower than the Act-wide definition *is not conductive to clarity*. … In this respect (as in countless others), the Act is far from a *chef d'oeuvre* of legislative draftsmanship." 573 U.S.

at 319. (Emphasis added). This lack of clarity is significant under the major questions doctrine.

Applying major questions doctrine analysis to whether GHGs are an "air pollutant" for purposes of 42 U.S.C. 7602(g) should lead to only one conclusion. In every material respect the criteria of the major questions doctrine are established even more firmly than in prior cases applying the doctrine. Given that fossil fuels are both ubiquitous and indispensable to every aspect of society, granting authority to regulate GHG emissions must rank as the broadest and most consequential claim of regulatory authority in the history of the administrative state. Claims of authority far less grandiose than this were cut down as going far too far under the major questions doctrine in *West Virginia v. EPA* and the precedents it relied on.

Any commitment to manage the weather by regulating GHG emissions will necessarily extend its ambitions to cover the ubiquity of human activities that result in such emissions. Its logic, once accepted, inevitably becomes a totalizing ideology, as seen in the behavior of its most zealous advocates. This is also reflected, only slightly less radically, in calls for the imposition of so-called "net zero" emission schemes by dates that are *obviously* impossible to achieve and destructive to attempt.

The statutory basis of the authority relied upon as the foundation of this attempt to remake human civilization through climate policy is as thin if not

thinner than those deemed inadequate in the major question doctrine precedents.

Viewed in light of the clear statement requirement of the major questions doctrine, the statutory analysis of the majority in *Massachusetts v. EPA,* even as modified in *Utility Air*, makes clear there is no sufficiently clear statutory grant of the vast authority EPA claims after that decision. The Court in *Massachusetts v. EPA* conceded—very significantly—that the Congress that drafted Section 202(a)(1) "might not have appreciated the possibility that burning fossil fuels could lead to global warming." To bolster its interpretation that "air pollutant" included "all airborne compounds of whatever stripe" including GHGs, the Court chose a quotation that confirms the point: "'[T]he fact that a statute can be applied in situations *not expressly anticipated by Congress* does not demonstrate ambiguity. It demonstrates breadth.'" 549 U.S. at 532, *citing Pennsylvania Dept. of Corrections v. Yeskey*, 524 U.S. 206, 212 (1998) (emphasis added). That falls far short—light years short—of the type of unmistakably clear statement necessary to support the sweeping authority over the entire scope of human activity that flows from authority to regulate GHG emissions. The reasoning that was supportive then is fatal now. "We are confident that Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion." *Brown & Williamson*, 529 U.S. at 160; *West Virginia v. EPA*, 142 S.Ct. at 2613.

EPA and the Intervenor Respondents may argue that the recently-passed "Inflation Reduction Act," H.R. 5376, Public Law No. 117-19, supplies the requisite clear statement that is missing in 42 USC § 7602(g). While the Inflation Reduction Act did repeatedly define GHGs as "air pollutants," *see*, e.g., § 60101, inserting the definition in a new CAA § 132(d)(4), this is not a clear statement of newly granted regulatory authority because it was a reconciliation bill, entitled "An Act To provide for reconciliation pursuant to title II of S. Con. Res. 14." Under the "Byrd Rule," which became law by amendment to Section 313 of the Congressional Budget Act, 2 U.S.C. § 644, "extraneous matters" that go beyond changing spending, revenues or the debt limit are not permitted. Moreover, even if substantive changes were permitted, which they were not, nothing in the Inflation Reduction Act even purports to amend the operative definition of "air pollutant" in 42 U.S.C. 7602(g) that was at issue in *Massachusetts v. EPA*. Moreover, the decision in *Utility Air* makes clear that whether the term "air pollutant" includes GHGs depends on where in the Clean Air Act it is found.

The Supreme Court has already invalidated two major GHG regulations under the major questions doctrine in *Utility Air* and *West Virginia v. EPA*. The original sin was the interpretation in *Massachusetts v. EPA* that GHGs were an "air pollutant," an interpretation that could not have been made if decided for the first

time under the major questions doctrine. Therefore, whether GHGs are an "air pollutant" at all under the Clean Air Act should be revisited.

## CONCLUSION

For the foregoing reasons, the Denial of these Petitions for Reconsideration of the Endangerment Finding should be vacated and remanded for reasoned decision making that honestly addresses Petitioners' arguments.

Respectfully submitted,

/s/ Harry W. MacDougald
Harry W. MacDougald
Georgia Bar No. 463076
Caldwell, Carlson, Elliott & DeLoach LLP
Two Ravinia Drive, Suite 1600
Atlanta, Georgia 30346
(404) 843-1956
hmacdougald@ccedlaw.com

/s/ Francis Menton
Francis Menton
Law Office of Francis Menton
85 Broad Street, 18th floor
New York, New York 10004
(212) 627-1796
fmenton@manhattancontrarian.com

Attorneys for Concerned Household
       Electricity Consumers Council and its
members *and*

FAIR Energy Foundation

## APPENDIX A — STATUTORY ADDENDUM

### I.    CLEAN AIR ACT SECTION 307, 42 U.S.C.A. § 7607

§ 7607. Administrative proceedings and judicial review

(a) Administrative subpoenas; confidentiality; witnesses

In connection with any determination under section 7410(f) of this title, or for purposes of obtaining information under section 7521(b)(4)1 or 7545(c)(3) of this title, any investigation, monitoring, reporting requirement, entry, compliance inspection, or administrative enforcement proceeding under the2 chapter (including but not limited to section 7413, section 7414, section 7420, section 7429, section 7477, section 7524, section 7525, section 7542, section 7603, or section 7606 of this title),,3 the Administrator may issue subpoenas for the attendance and testimony of witnesses and the production of relevant papers, books, and documents, and he may administer oaths. Except for emission data, upon a showing satisfactory to the Administrator by such owner or operator that such papers, books, documents, or information or particular part thereof, if made public, would divulge trade secrets or secret processes of such owner or operator, the Administrator shall consider such record, report, or information or particular portion thereof confidential in accordance with the purposes of section 1905 of Title 18, except that such paper, book, document, or information may be disclosed to other officers, employees, or authorized representatives of the United States concerned with carrying out this chapter, to persons carrying out the National Academy of Sciences' study and investigation provided for in section 7521(c) of this title, or when relevant in any proceeding under this chapter. Witnesses summoned shall be paid the same fees and mileage that are paid witnesses in the courts of the United States. In case of contumacy or refusal to obey a subpoena served upon any person under this subparagraph4, the district court of the United States for any district in which such person is found or resides or transacts business, upon application by the United States and after notice to such person, shall have jurisdiction to issue an order requiring such person to appear and give testimony before the Administrator to appear and produce papers, books, and documents before the Administrator, or both, and any failure to obey such order of the court may be punished by such court as a contempt thereof.

(b) Judicial review

(1) A petition for review of action of the Administrator in promulgating any national primary or secondary ambient air quality standard, any emission

standard or requirement under section 7412 of this title, any standard of performance or requirement under section 7411 of this title,,3 any standard under section 7521 of this title (other than a standard required to be prescribed under section 7521(b)(1) of this title), any determination under section 7521(b)(5)1 of this title, any control or prohibition under section 7545 of this title, any standard under section 7571 of this title, any rule issued under section 7413, 7419, or under section 7420 of this title, or any other nationally applicable regulations promulgated, or final action taken, by the Administrator under this chapter may be filed only in the United States Court of Appeals for the District of Columbia. A petition for review of the Administrator's action in approving or promulgating any implementation plan under section 7410 of this title or section 7411(d) of this title, any order under section 7411(j) of this title, under section 7412 of this title, under section 7419 of this title, or under section 7420 of this title, or his action under section 1857c-10(c)(2)(A), (B), or (C) of this title (as in effect before August 7, 1977) or under regulations thereunder, or revising regulations for enhanced monitoring and compliance certification programs under section 7414(a)(3) of this title, or any other final action of the Administrator under this chapter (including any denial or disapproval by the Administrator under subchapter I) which is locally or regionally applicable may be filed only in the United States Court of Appeals for the appropriate circuit. Notwithstanding the preceding sentence a petition for review of any action referred to in such sentence may be filed only in the United States Court of Appeals for the District of Columbia if such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination. Any petition for review under this subsection shall be filed within sixty days from the date notice of such promulgation, approval, or action appears in the Federal Register, except that if such petition is based solely on grounds arising after such sixtieth day, then any petition for review under this subsection shall be filed within sixty days after such grounds arise. The filing of a petition for reconsideration by the Administrator of any otherwise final rule or action shall not affect the finality of such rule or action for purposes of judicial review nor extend the time within which a petition for judicial review of such rule or action under this section may be filed, and shall not postpone the effectiveness of such rule or action.

(2) Action of the Administrator with respect to which review could have been obtained under paragraph (1) shall not be subject to judicial review in civil or criminal proceedings for enforcement. Where a final decision by the

Administrator defers performance of any nondiscretionary statutory action to a later time, any person may challenge the deferral pursuant to paragraph (1).

(c) Additional evidence

In any judicial proceeding in which review is sought of a determination under this chapter required to be made on the record after notice and opportunity for hearing, if any party applies to the court for leave to adduce additional evidence, and shows to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the proceeding before the Administrator, the court may order such additional evidence (and evidence in rebuttal thereof) to be taken before the Administrator, in such manner and upon such terms and conditions as to5 the court may deem proper. The Administrator may modify his findings as to the facts, or make new findings, by reason of the additional evidence so taken and he shall file such modified or new findings, and his recommendation, if any, for the modification or setting aside of his original determination, with the return of such additional evidence.

(d) Rulemaking

(1) This subsection applies to--

(A) the promulgation or revision of any national ambient air quality standard under section 7409 of this title,

(B) the promulgation or revision of an implementation plan by the Administrator under section 7410(c) of this title,

(C) the promulgation or revision of any standard of performance under section 7411 of this title, or emission standard or limitation under section 7412(d) of this title, any standard under section 7412(f) of this title, or any regulation under section 7412(g)(1)(D) and (F) of this title, or any regulation under section 7412(m) or (n) of this title,

(D) the promulgation of any requirement for solid waste combustion under section 7429 of this title,

(E) the promulgation or revision of any regulation pertaining to any fuel or fuel additive under section 7545 of this title,

(F) the promulgation or revision of any aircraft emission standard under section 7571 of this title,

(G) the promulgation or revision of any regulation under subchapter IV-A (relating to control of acid deposition),

(H) promulgation or revision of regulations pertaining to primary nonferrous smelter orders under section 7419 of this title (but not including the granting or denying of any such order),

(I) promulgation or revision of regulations under subchapter VI of (relating to stratosphere and ozone protection),

(J) promulgation or revision of regulations under part C of subchapter I (relating to prevention of significant deterioration of air quality and protection of visibility),

(K) promulgation or revision of regulations under section 7521 of this title and test procedures for new motor vehicles or engines under section 7525 of this title, and the revision of a standard under section 7521(a)(3) of this title,

(L) promulgation or revision of regulations for noncompliance penalties under section 7420 of this title,

(M) promulgation or revision of any regulations promulgated under section 7541 of this title (relating to warranties and compliance by vehicles in actual use),

(N) action of the Administrator under section 7426 of this title (relating to interstate pollution abatement),

(O) the promulgation or revision of any regulation pertaining to consumer and commercial products under section 7511b(e) of this title,

(P) the promulgation or revision of any regulation pertaining to field citations under section 7413(d)(3) of this title,

(Q) the promulgation or revision of any regulation pertaining to urban buses or the clean-fuel vehicle, clean-fuel fleet, and clean fuel programs under part C of subchapter II,

(R) the promulgation or revision of any regulation pertaining to nonroad engines or nonroad vehicles under section 7547 of this title,

(S) the promulgation or revision of any regulation relating to motor vehicle compliance program fees under section 7552 of this title,

(T) the promulgation or revision of any regulation under subchapter IV-A (relating to acid deposition),

(U) the promulgation or revision of any regulation under section 7511b(f) of this title pertaining to marine vessels, and

(V) such other actions as the Administrator may determine.

The provisions of section 553 through 557 and section 706 of Title 5 shall not, except as expressly provided in this subsection, apply to actions to which this subsection applies. This subsection shall not apply in the case of any rule or circumstance referred to in subparagraphs (A) or (B) of subsection 553(b) of Title 5.

(2) Not later than the date of proposal of any action to which this subsection applies, the Administrator shall establish a rulemaking docket for such action (hereinafter in this subsection referred to as a "rule"). Whenever a rule applies only within a particular State, a second (identical) docket shall be simultaneously established in the appropriate regional office of the Environmental Protection Agency.

(3) In the case of any rule to which this subsection applies, notice of proposed rulemaking shall be published in the Federal Register, as provided under section 553(b) of Title 5, shall be accompanied by a statement of its basis and purpose and shall specify the period available for public comment (hereinafter referred to as the "comment period"). The notice of proposed rulemaking shall also state the docket number, the location or locations of the docket, and the times it will be open to public inspection. The statement of basis and purpose shall include a summary of--

(A) the factual data on which the proposed rule is based;

(B) the methodology used in obtaining the data and in analyzing the data; and

(C) the major legal interpretations and policy considerations underlying the proposed rule.

The statement shall also set forth or summarize and provide a reference to any pertinent findings, recommendations, and comments by the Scientific Review Committee established under section 7409(d) of this title and the National Academy of Sciences, and, if the proposal differs in any important respect from

64

any of these recommendations, an explanation of the reasons for such differences. All data, information, and documents referred to in this paragraph on which the proposed rule relies shall be included in the docket on the date of publication of the proposed rule.

(4)(A) The rulemaking docket required under paragraph (2) shall be open for inspection by the public at reasonable times specified in the notice of proposed rulemaking. Any person may copy documents contained in the docket. The Administrator shall provide copying facilities which may be used at the expense of the person seeking copies, but the Administrator may waive or reduce such expenses in such instances as the public interest requires. Any person may request copies by mail if the person pays the expenses, including personnel costs to do the copying.

(B)(i) Promptly upon receipt by the agency, all written comments and documentary information on the proposed rule received from any person for inclusion in the docket during the comment period shall be placed in the docket. The transcript of public hearings, if any, on the proposed rule shall also be included in the docket promptly upon receipt from the person who transcribed such hearings. All documents which become available after the proposed rule has been published and which the Administrator determines are of central relevance to the rulemaking shall be placed in the docket as soon as possible after their availability.

(ii) The drafts of proposed rules submitted by the Administrator to the Office of Management and Budget for any interagency review process prior to proposal of any such rule, all documents accompanying such drafts, and all written comments thereon by other agencies and all written responses to such written comments by the Administrator shall be placed in the docket no later than the date of proposal of the rule. The drafts of the final rule submitted for such review process prior to promulgation and all such written comments thereon, all documents accompanying such drafts, and written responses thereto shall be placed in the docket no later than the date of promulgation.

(5) In promulgating a rule to which this subsection applies (i) the Administrator shall allow any person to submit written comments, data, or documentary information; (ii) the Administrator shall give interested persons an opportunity for the oral presentation of data, views, or arguments, in addition to an opportunity to make written submissions; (iii) a transcript shall be kept of any oral presentation; and (iv) the Administrator shall keep the record of such

65

proceeding open for thirty days after completion of the proceeding to provide an opportunity for submission of rebuttal and supplementary information.

(6)(A) The promulgated rule shall be accompanied by (i) a statement of basis and purpose like that referred to in paragraph (3) with respect to a proposed rule and (ii) an explanation of the reasons for any major changes in the promulgated rule from the proposed rule.

(B) The promulgated rule shall also be accompanied by a response to each of the significant comments, criticisms, and new data submitted in written or oral presentations during the comment period.

(C) The promulgated rule may not be based (in part or whole) on any information or data which has not been placed in the docket as of the date of such promulgation.

(7)(A) The record for judicial review shall consist exclusively of the material referred to in paragraph (3), clause (i) of paragraph (4)(B), and subparagraphs (A) and (B) of paragraph (6).

(B) Only an objection to a rule or procedure which was raised with reasonable specificity during the period for public comment (including any public hearing) may be raised during judicial review. If the person raising an objection can demonstrate to the Administrator that it was impracticable to raise such objection within such time or if the grounds for such objection arose after the period for public comment (but within the time specified for judicial review) and if such objection is of central relevance to the outcome of the rule, the Administrator shall convene a proceeding for reconsideration of the rule and provide the same procedural rights as would have been afforded had the information been available at the time the rule was proposed. If the Administrator refuses to convene such a proceeding, such person may seek review of such refusal in the United States court of appeals for the appropriate circuit (as provided in subsection (b)). Such reconsideration shall not postpone the effectiveness of the rule. The effectiveness of the rule may be stayed during such reconsideration, however, by the Administrator or the court for a period not to exceed three months.

(8) The sole forum for challenging procedural determinations made by the Administrator under this subsection shall be in the United States court of appeals for the appropriate circuit (as provided in subsection (b)) at the time of the substantive review of the rule. No interlocutory appeals shall be permitted with

66

respect to such procedural determinations. In reviewing alleged procedural errors, the court may invalidate the rule only if the errors were so serious and related to matters of such central relevance to the rule that there is a substantial likelihood that the rule would have been significantly changed if such errors had not been made.

(9) In the case of review of any action of the Administrator to which this subsection applies, the court may reverse any such action found to be--

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or

(D) without observance of procedure required by law, if (i) such failure to observe such procedure is arbitrary or capricious, (ii) the requirement of paragraph (7)(B) has been met, and (iii) the condition of the last sentence of paragraph (8) is met.

(10) Each statutory deadline for promulgation of rules to which this subsection applies which requires promulgation less than six months after date of proposal may be extended to not more than six months after date of proposal by the Administrator upon a determination that such extension is necessary to afford the public, and the agency, adequate opportunity to carry out the purposes of this subsection.

(11) The requirements of this subsection shall take effect with respect to any rule the proposal of which occurs after ninety days after August 7, 1977.

(e) Other methods of judicial review not authorized

Nothing in this chapter shall be construed to authorize judicial review of regulations or orders of the Administrator under this chapter, except as provided in this section.

(f) Costs

In any judicial proceeding under this section, the court may award costs of litigation (including reasonable attorney and expert witness fees) whenever it determines that such award is appropriate.

(g) Stay, injunction, or similar relief in proceedings relating to noncompliance penalties

In any action respecting the promulgation of regulations under section 7420 of this title or the administration or enforcement of section 7420 of this title no court shall grant any stay, injunctive, or similar relief before final judgment by such court in such action.

(h) Public participation

It is the intent of Congress that, consistent with the policy of subchapter II of chapter 5 of Title 5, the Administrator in promulgating any regulation under this chapter, including a regulation subject to a deadline, shall ensure a reasonable period for public participation of at least 30 days, except as otherwise expressly provided in section6 7407(d), 7502(a), 7511(a) and (b), and 7512(a) and (b) of this title.

## II.   CLEAN AIR ACT § 302, 42 U.S.C. § 7602

### §7602. Definitions

When used in this chapter—

(a) The term "Administrator" means the Administrator of the Environmental Protection Agency.

(b) The term "air pollution control agency" means any of the following:

(1) A single State agency designated by the Governor of that State as the official State air pollution control agency for purposes of this chapter.

(2) An agency established by two or more States and having substantial powers or duties pertaining to the prevention and control of air pollution.

(3) A city, county, or other local government health authority, or, in the case of any city, county, or other local government in which there is an agency other than the health authority charged with responsibility for enforcing ordinances or laws relating to the prevention and control of air pollution, such other agency.

(4) An agency of two or more municipalities located in the same State or in different States and having substantial powers or duties pertaining to the prevention and control of air pollution.

(5) An agency of an Indian tribe.

(c) The term "interstate air pollution control agency" means—

(1) an air pollution control agency established by two or more States, or

(2) an air pollution control agency of two or more municipalities located in different States.

(d) The term "State" means a State, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, and American Samoa and includes the Commonwealth of the Northern Mariana Islands.

(e) The term "person" includes an individual, corporation, partnership, association, State, municipality, political subdivision of a State, and any agency, department, or instrumentality of the United States and any officer, agent, or employee thereof.

(f) The term "municipality" means a city, town, borough, county, parish, district, or other public body created by or pursuant to State law.

(g) The term "air pollutant" means any air pollution agent or combination of such agents, including any physical, chemical, biological, radioactive (including source material, special nuclear material, and byproduct material) substance or matter which is emitted into or otherwise enters the ambient air. Such term includes any precursors to the formation of any air pollutant, to the extent the Administrator has identified such precursor or precursors for the particular purpose for which the term "air pollutant" is used.

(h) All language referring to effects on welfare includes, but is not limited to, effects on soils, water, crops, vegetation, manmade materials, animals, wildlife, weather, visibility, and climate, damage to and deterioration of property, and hazards to transportation, as well as effects on economic values and on personal comfort and well-being, whether caused by transformation, conversion, or combination with other air pollutants.

(i) The term "Federal land manager" means, with respect to any lands in the United States, the Secretary of the department with authority over such lands.

(j) Except as otherwise expressly provided, the terms "major stationary source" and "major emitting facility" mean any stationary facility or source of air pollutants which directly emits, or has the potential to emit, one hundred tons per year or

more of any air pollutant (including any major emitting facility or source of fugitive emissions of any such pollutant, as determined by rule by the Administrator).

(k) The terms "emission limitation" and "emission standard" mean a requirement established by the State or the Administrator which limits the quantity, rate, or concentration of emissions of air pollutants on a continuous basis, including any requirement relating to the operation or maintenance of a source to assure continuous emission reduction, and any design, equipment, work practice or operational standard promulgated under this chapter..[1]

(l) The term "standard of performance" means a requirement of continuous emission reduction, including any requirement relating to the operation or maintenance of a source to assure continuous emission reduction.

(m) The term "means of emission limitation" means a system of continuous emission reduction (including the use of specific technology or fuels with specified pollution characteristics).

(n) The term "primary standard attainment date" means the date specified in the applicable implementation plan for the attainment of a national primary ambient air quality standard for any air pollutant.

(o) The term "delayed compliance order" means an order issued by the State or by the Administrator to an existing stationary source, postponing the date required under an applicable implementation plan for compliance by such source with any requirement of such plan.

(p) The term "schedule and timetable of compliance" means a schedule of required measures including an enforceable sequence of actions or operations leading to compliance with an emission limitation, other limitation, prohibition, or standard.

(q) For purposes of this chapter, the term "applicable implementation plan" means the portion (or portions) of the implementation plan, or most recent revision thereof, which has been approved under section 7410 of this title, or promulgated under section 7410(c) of this title, or promulgated or approved pursuant to regulations promulgated under section 7601(d) of this title and which implements the relevant requirements of this chapter.

(r) Indian Tribe.—The term "Indian tribe" means any Indian tribe, band, nation, or other organized group or community, including any Alaska Native village,

which is Federally recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians.

(s) VOC.—The term "VOC" means volatile organic compound, as defined by the Administrator.

(t) PM–10.—The term "PM–10" means particulate matter with an aerodynamic diameter less than or equal to a nominal ten micrometers, as measured by such method as the Administrator may determine.

(u) NAAQS and CTG.—The term "NAAQS" means national ambient air quality standard. The term "CTG" means a Control Technique Guideline published by the Administrator under section 7408 of this title.

(v) $NO_x$.—The term "$NO_x$" means oxides of nitrogen.

(w) CO.—The term "CO" means carbon monoxide.

(x) Small Source.—The term "small source" means a source that emits less than 100 tons of regulated pollutants per year, or any class of persons that the Administrator determines, through regulation, generally lack technical ability or knowledge regarding control of air pollution.

(y) Federal Implementation Plan.—The term "Federal implementation plan" means a plan (or portion thereof) promulgated by the Administrator to fill all or a portion of a gap or otherwise correct all or a portion of an inadequacy in a State implementation plan, and which includes enforceable emission limitations or other control measures, means or techniques (including economic incentives, such as marketable permits or auctions of emissions allowances), and provides for attainment of the relevant national ambient air quality standard.

(z) Stationary Source.—The term "stationary source" means generally any source of an air pollutant except those emissions resulting directly from an internal combustion engine for transportation purposes or from a nonroad engine or nonroad vehicle as defined in section 7550 of this title.

## III.    2 U.S.C. § 644

### § 644. Extraneous matter in reconciliation legislation

(a) In general

When the Senate is considering a reconciliation bill or a reconciliation resolution pursuant to section 641 of this title (whether that bill or resolution originated in the Senate or the House) or section 907d of this title, upon a point of order being made by any Senator against material extraneous to the instructions to a committee which is contained in any title or provision of the bill or resolution or offered as an amendment to the bill or resolution, and the point of order is sustained by the Chair, any part of said title or provision that contains material extraneous to the instructions to said Committee as defined in subsection (b) shall be deemed stricken from the bill and may not be offered as an amendment from the floor.

(b) Extraneous provisions

(1)(A) Except as provided in paragraph (2), a provision of a reconciliation bill or reconciliation resolution considered pursuant to section 641 of this title shall be considered extraneous if such provision does not produce a change in outlays or revenues, including changes in outlays and revenues brought about by changes in the terms and conditions under which outlays are made or revenues are required to be collected (but a provision in which outlay decreases or revenue increases exactly offset outlay increases or revenue decreases shall not be considered extraneous by virtue of this subparagraph); (B) any provision producing an increase in outlays or decrease in revenues shall be considered extraneous if the net effect of provisions reported by the committee reporting the title containing the provision is that the committee fails to achieve its reconciliation instructions; (C) a provision that is not in the jurisdiction of the committee with jurisdiction over said title or provision shall be considered extraneous; (D) a provision shall be considered extraneous if it produces changes in outlays or revenues which are merely incidental to the non-budgetary components of the provision; (E) a provision shall be considered to be extraneous if it increases, or would increase, net outlays, or if it decreases, or would decrease, revenues during a fiscal year after the fiscal years covered by such reconciliation bill or reconciliation resolution, and such increases or decreases are greater than outlay reductions or revenue increases resulting from other provisions in such title in such year; and (F) a provision shall be considered extraneous if it violates section 641(g) of this title.

(2) A Senate-originated provision shall not be considered extraneous under paragraph (1)(A) if the Chairman and Ranking Minority Member of the Committee on the Budget and the Chairman and Ranking Minority Member of the Committee which reported the provision certify that: (A) the provision mitigates direct effects clearly attributable to a provision changing outlays or

72

revenues and both provisions together produce a net reduction in the deficit; (B) the provision will result in a substantial reduction in outlays or a substantial increase in revenues during fiscal years after the fiscal years covered by the reconciliation bill or reconciliation resolution; (C) a reduction of outlays or an increase in revenues is likely to occur as a result of the provision, in the event of new regulations authorized by the provision or likely to be proposed, court rulings on pending litigation, or relationships between economic indices and stipulated statutory triggers pertaining to the provision, other than the regulations, court rulings or relationships currently projected by the Congressional Budget Office for scorekeeping purposes; or (D) such provision will be likely to produce a significant reduction in outlays or increase in revenues but, due to insufficient data, such reduction or increase cannot be reliably estimated.

**(3)** A provision reported by a committee shall not be considered extraneous under paragraph (1)(C) if (A) the provision is an integral part of a provision or title, which if introduced as a bill or resolution would be referred to such committee, and the provision sets forth the procedure to carry out or implement the substantive provisions that were reported and which fall within the jurisdiction of such committee; or (B) the provision states an exception to, or a special application of, the general provision or title of which it is a part and such general provision or title if introduced as a bill or resolution would be referred to such committee.

(c) Extraneous materials

Upon the reporting or discharge of a reconciliation bill or resolution pursuant to section 641 of this title in the Senate, and again upon the submission of a conference report on such a reconciliation bill or resolution, the Committee on the Budget of the Senate shall submit for the record a list of material considered to be extraneous under subsections (b)(1)(A), (b)(1)(B), and (b)(1)(E) of this section to the instructions of a committee as provided in this section. The inclusion or exclusion of a provision shall not constitute a determination of extraneousness by the Presiding Officer of the Senate.

(d) Conference reports

When the Senate is considering a conference report on, or an amendment between the Houses in relation to, a reconciliation bill or reconciliation resolution pursuant to section 641 of this title, upon--

73

(1) a point of order being made by any Senator against extraneous material meeting the definition of subsections (b)(1)(A), (b)(1)(B), (b)(1)(D), (b)(1)(E), or (b)(1)(F), and

(2) such point of order being sustained, such material contained in such conference report or amendment shall be deemed stricken, and the Senate shall proceed, without intervening action or motion, to consider the question of whether the Senate shall recede from its amendment and concur with a further amendment, or concur in the House amendment with a further amendment, as the case may be, which further amendment shall consist of only that portion of the conference report or House amendment, as the case may be, not so stricken. Any such motion in the Senate shall be debatable for two hours. In any case in which such point of order is sustained against a conference report (or Senate amendment derived from such conference report by operation of this subsection), no further amendment shall be in order.

(e) General point of order

Notwithstanding any other law or rule of the Senate, it shall be in order for a Senator to raise a single point of order that several provisions of a bill, resolution, amendment, motion, or conference report violate this section. The Presiding Officer may sustain the point of order as to some or all of the provisions against which the Senator raised the point of order. If the Presiding Officer so sustains the point of order as to some of the provisions (including provisions of an amendment, motion, or conference report) against which the Senator raised the point of order, then only those provisions (including provisions of an amendment, motion, or conference report) against which the Presiding Officer sustains the point of order shall be deemed stricken pursuant to this section. Before the Presiding Officer rules on such a point of order, any Senator may move to waive such a point of order as it applies to some or all of the provisions against which the point of order was raised. Such a motion to waive is amendable in accordance with the rules and precedents of the Senate. After the Presiding Officer rules on such a point of order, any Senator may appeal the ruling of the Presiding Officer on such a point of order as it applies to some or all of the provisions on which the Presiding Officer ruled.

## IV.    5 U.S.C.A. § 553

§ 553. Rule making

(a) This section applies, according to the provisions thereof, except to the extent that there is involved--

> (1) a military or foreign affairs function of the United States; or

> (2) a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts.

(b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include--

> (1) a statement of the time, place, and nature of public rule making proceedings;

> (2) reference to the legal authority under which the rule is proposed; and

> (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

> Except when notice or hearing is required by statute, this subsection does not apply--

>> (A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or

>> (B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

(c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. When rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title apply instead of this subsection.

(d) The required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except--

(1) a substantive rule which grants or recognizes an exemption or relieves a restriction;

(2) interpretative rules and statements of policy; or

(3) as otherwise provided by the agency for good cause found and published with the rule.

(e) Each agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule.

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME AND TYPEFACE LIMITATIONS

I HEREBY CERTIFY THAT that the foregoing **Brief of Petitioners** complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(C). As determined by the Microsoft Word software used to produce this brief, it contains 12,997 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Circuit Rule 32(a)(1).

I further certify that this document is prepared using the Times New Roman font in the 14-point size.

Dated: October 14, 2022

/s/ Harry W. MacDougald
Harry W. MacDougald
Georgia Bar No. 463076

*Counsel for Petitioners*

Caldwell, Carlson, Elliott & DeLoach LLP
Two Ravinia Drive, Suite 1600
Atlanta, Georgia 30346
(404) 843-1956
hmacdougald@ccedlaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing BRIEF OF PETITIONERS was filed electronically with the Court by using the CM/ECF system on this 14th day of October, 2022. Counsel for the Respondent and Respondent's Intervenors are registered CM/ECF users and will be served by the appellate CM/ECF system. In addition, service by email will be made upon the following Counsel for the Respondent and Respondent's Intervenors at the email addresses indicated below.

October 14, 2022.

Brian Lynk
U.S. Department of Justice
Energy and Natural Resources Division
brian.lynk@usdoj.gov

Sean Donahue
Donahue & Goldberg, LLP
sean@donahuegoldberg.com

/s/ Harry W. MacDougald
Harry W. MacDougald
Georgia Bar No. 463076

*Counsel for Petitioners*

Caldwell, Carlson, Elliott & DeLoach LLP
Two Ravinia Drive, Suite 1600
Atlanta, Georgia 30346
(404) 843-1956
hmacdougald@ccedlaw.com