No. 22-1139

_____

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

CONCERNED HOUSEHOLD ELECTRICITY CONSUMERS COUNCIL,

**Petitioners,**

**v.**

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

**Respondent**

_____

**On Consolidated Petitions for Review of Environmental Protection Agency
Final Order**

_____

**Consolidated with Case No. 22-1140**

_____

**PETITIONERS' COMBINED PETITION FOR PANEL
REHEARING AND REHEARING EN BANC**

_____

<div style="display:flex">

**Harry W. MacDougald**
**Caldwell, Carlson, Elliott &
DeLoach LLP**
**Two Ravinia Drive, Suite 1600**
**Atlanta, Georgia 30346**
**(404) 843-1956**
hmacdougald@ccedlaw.com

**Francis Menton**
**Law Office of Francis Menton**
**85 Broad Street, 18th floor**
**New York, New York 10004**
**(212) 627-1796**
**fmenton@manhattancontrarian.com**

</div>

*Attorneys for Petitioners in Case No. 22-1139 and 22-1140*

**July 10, 2023**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ iii

PETITION FOR REHEARING EN BANC ...........................................................1

    I.    This Proceeding Involves a Question of Exceptional Importance ........1

    II.    The Panel Relies on a Quirk of Timing To Disregard a
Regulatory Onslaught Flowing From the 2009 Endangerment
Finding That Everyone Knew Was Coming. ........................................4

    III.    Both the Vehicle Rule and the Power Plant Rule Are Explicitly
Premised on the 2009 Endangerment Finding ......................................8

    IV.    Injury in Fact From the Effect on Electricity Costs To
Consumers of Fossil Fuel Suppression is Demonstrated by
Government Data. ...................................................................................9

    V.    The Rules of Standing Applied to Petitioners are Inconsistent
With those Applied To Politically Favored Groups Like
Environmental Activists. .....................................................................15

    VI.    Entities Representing the Interests of Consumers Are the Only
Ones With the Interest and Incentive to Challenge EPA's
Endangerment Finding. ........................................................................18

CONCLUSION ..................................................................................................20

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME AND
TYPEFACE LIMITATIONS.............................................................................22

CERTIFICATE OF SERVICE .........................................................................23

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ...........24

PANEL OPINION .............................................................................................26

# TABLE OF AUTHORITIES

**Cases**

*American Lung Association v. Environmental Protection Agency*, 985 F.3d 914 (2021) *reversed and remanded*, *West Virginia v. EPA,* ___ U.S. ___, 142 S.Ct. 2587 (2022) ...................................................................... 5, 27

*Coal. for Responsible Regul., Inc. v. E.P.A.*, 684 F.3d 102 (D.C. Cir. 2012), *aff'd in part, rev'd in part sub nom. Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302 (2014), and *amended sub nom. Coal. for Responsible Regul., Inc. v. Env't Prot. Agency*, 606 F. App'x 6 (D.C. Cir. 2015) ............................... 21, 28

*Massachusetts v. EPA,* 549 U.S. 497 (2007) ...................................................... 2, 19

*Natural Resources Defense Council v. Wheeler*, 955 F.3d 68 (2020) .......... 4, 17, 19

*Sierra v. City of Hallandale Beach, Florida*, 996 F.3d 1110 (2021) ....................... 20

*U.S. v. Texas*, ___ U.S. ___, Case No. No. 22–58 (Jun. 23, 2023) ........................ 20

*Utility Air Regulatory Group v. EPA*, 573 U.S. 302 (2014) ................................... 6

*West Virginia v. EPA,* ___ U.S. ___, 142 S.Ct. 2587 (2022) ............................... 6, 7

**Other Authorities**

*Executive Order on Tackling the Climate Crisis at Home and Abroad,* https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/27/executive-order-on-tackling-the-climate-crisis-at-home-and-abroad/ ........................................................................................ 6

**Rules**

Fed.R.Evid. 803(8)(a)(ii) ......................................................................................... 9

**Regulations**

Emission Guidelines for Greenhouse Gas Emissions From Existing Electric Utility Generating Units; Revisions to Emission Guideline Implementing Regulations; Revisions to New Source Review Program, 83 Fed. Reg. 44746 (Aug. 31, 2018) .................................................................................. 6, 7

Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act; Final Action on Petitions, 87 Fed. Reg. 25412 (Apr. 29, 2022) ........................................................................ 25

Endangerment and Cause or Contribute Findings for Greenhouse Gases
  Under Section 202(a) of the Clean Air Act" (74 F.R. 66496, Dec. 15,
  2009) ................................................................ 2, 3, 4, 5, 6, 8, 9, 14, 18, 20, 25

Prevention of Significant Deterioration and Title V Greenhouse Gas
  Tailoring Rule, 75 Fed. Reg. 31514 (June 3, 2010) ...............................................5

Reconsideration of Interpretation of Regulations that Determine Pollutants
  Covered by Clean Air Act Permitting Programs, 75 Fed. Reg. 17004 (Apr.
  2, 2010) ....................................................................................................................5

**Other References**

2022-23 Ski Season Analysis as of May 27, 2023, Bestsnow.net,
  https://bestsnow.net/seas23.htm...........................................................................17

*Amid Heated Debates, EPA Steps Up The Pace For Major Climate Rules,*
  INSIDE EPA'S CLIMATE EXTRA, Jun. 14, 2023,
  https://insideepa.com/climate-insider/amid-heated-debates-epa-steps-pace-
  major-climate-rules ................................................................................................7

*Carpenters Industrial Council v. Zinke*, 854 F.3d 1 (2017). ..................................13

*Kelsey Cascadia Rose Juliana v. United States*, 947 F.3d 1159 (9th Cir.
  2020) ................................................................................................................ 16, 17

Steve Hayward, *The Daily Chart: The Big Green Energy Lie*, POWERLINE
  BLOG available at https://www.powerlineblog.com/archives/2023/06/the-
  daily-chart-the-big-green-energy-lie.php...............................................................13

U.S. Dept. of Agriculture, Natural Resources Conservation Service, National
  Water and Climate Center, Westwide SNOTEL Water Year (Oct 1) to
  Date Precipitation % of Normal
  https://www.wcc.nrcs.usda.gov/ftpref/data/water/wcs/gis/maps/west_wytd
  precpctnormal_update.pdf ....................................................................................17

U.S. Energy Information Administration, ELECTRIC POWER MONTHLY, *Table
  5.6A, Average Price of Electricity by End-Use Sector, by State, April 2023
  and 2022.* https://www.eia.gov/electricity/monthly/ .............................................12

**PETITION FOR REHEARING EN BANC**

Pursuant to Fed.R.App.P. 35 and Circuit Rule 35, Petitioners Concerned Household Electricity Consumers Council (CHECC) and FAIR Energy Foundation (FAIR) respectfully petition this court for *en banc* reconsideration of the Judgment herein dated May 25, 2023. The Judgment dismissed the claims of Petitioners on grounds of standing, without ever reaching the merits of the underlying Petition.

## I.   THIS PROCEEDING INVOLVES A QUESTION OF EXCEPTIONAL IMPORTANCE

This proceeding involves a question of exceptional importance, namely: Does the law of standing in this Circuit really preclude judicial review of the claimed scientific basis of the single largest regulatory transformation of the American economy ever attempted by the administrative state?

In dismissing Petitioners' claims in this matter for failure to establish standing as electricity consumers, the panel has forced off the field of play the only entities with an actual interest and incentive to mount an effective challenge to the Biden Administration's multi-trillion-dollar regulatory transformation of the energy economy. While the panel purports to base its decision on language from precedents, in substance the Judgment turns the law of standing on its head – in a

1

challenge to the foundation of the single most economically significant suite of regulatory initiatives in the history of the country.

Petitioners seek reconsideration by the EPA of its Greenhouse Gas Endangerment Finding, issued in 2009 (74 FR 66496). The 2009 Endangerment Finding is the entire and essential "scientific" basis for the flood of regulations pouring forth from the Biden Administration attempting to suppress fossil fuels, and force adoption of far more expensive energy sources. The additional costs to American consumers will be hundreds of billions of dollars or more. The economic impact to consumers is massive and unprecedented, most directly via the consumption of electricity, but rippling into the price of all goods and services. As former President Barack Obama said with respect to his own less comprehensive plan for fossil fuel: "Under my plan, . . . the price of electricity will necessarily skyrocket."

In *Massachusetts v. EPA,* 549 U.S. 497, 505-6 (2007), "the unusual importance of the underlying issue" persuaded the Court to grant certiorari notwithstanding the "serious" objections to standing.

Petitioners in this matter are all consumers of electricity. In their Petitions to EPA, and in briefing to this court, Petitioners proved the economic impact on them of fossil fuel suppression programs using publicly available data from jurisdictions that have advanced the furthest down that path – e.g., California, Germany and the

2

UK. California's electricity prices are already more than double those in over half the other lower 48 states. In Germany and the UK, electricity rates are already more than double the average levels in the U.S.

Meanwhile, the Biden Administration's proposed rules for fossil fuel suppression are far more ambitious and onerous than anything that so-called "climate leader" jurisdictions like California and Germany have yet achieved. Yet somehow the panel found that electricity consumers like Petitioners lack standing to challenge the Endangerment Finding, which is the first domino in a regulatory cascade that is certain to impose such costs on them and all other electricity consumers. The panel held, *"Petitioners fail to meet their burden to establish standing because they provide no evidence that they or any of their members have been injured by the Endangerment Finding."* Judgment, at 2.

The panel's articulation of the law of consumer standing is completely inconsistent with the case law on standing in this Circuit and throughout the United States for more favored categories of plaintiffs, most particularly those claiming any form of harm from environmental degradation, real or imagined. *See, e.g.*, *Natural Resources Defense Council v. Wheeler*, 955 F.3d 68, 76-77 (2020). By sidelining the only potentially effective current judicial challenge to the Biden Administration's regulatory onslaught, the panel ruling would in practice mean that hundreds of billions of dollars will have been spent (wasted), and consumer

3

electricity bills multiplied by a factor of five or ten or more, without any meaningful judicial challenge to the scientific validity of the foundation of those policies.

The Endangerment Finding on its merits is based on quicksand. As just the most obvious example, the Finding claims to rest on evidence of a significant surface temperature rise over the last century, which was derived from a record where close to half of the earth's surface has no data whatsoever for over 80% of the time period, so the required surface temperature data have been manufactured and infilled by algorithms (i.e., totally fabricated) to fit the government's preferred "Global Warming" narrative. Moreover, the invalidation of this Global Average Surface Temperature data has been shown by the plaintiffs to invalidate each of the three lines of evidence in EPA's 2009 GHG Endangerment Finding.

The law of standing cannot possibly mean that this claim cannot be heard on the merits. If it does, it needs to be changed.

## II.    THE PANEL RELIES ON A QUIRK OF TIMING TO DISREGARD A REGULATORY ONSLAUGHT FLOWING FROM THE 2009 ENDANGERMENT FINDING THAT EVERYONE KNEW WAS COMING.

The panel decision states that *"CHECC's brief does not identify a single regulation based on the Endangerment Finding that has affected its members."* Judgment, at 3. That statement exemplifies the doctrinal incoherence and

4

pettifoggery that is characteristic of the law of standing. It is undisputed that (1) the

Endangerment Finding *requires* EPA to regulate GHG emissions, *American Lung*

*Association v. Environmental Protection Agency*, 985 F.3d 914, 935-936 (2021)

*reversed and remanded*, *West Virginia v. EPA,* ___ U.S. ___, 142 S.Ct. 2587 (2022)

(GHG regulation mandated by the 2009 and 2015 endangerment findings), and (2)

EPA has repeatedly launched massive regulatory impositions on GHG emissions

which, up to now, have twice been overturned on major question grounds. Now,

EPA has launched two GHG regulations for mobile sources and power plants that

are far more aggressive than the GHG regulations invalidated on major questions

doctrine grounds in *Utility Air Regulatory Group v. EPA*, 573 U.S. 302 (2014) and

*West Virginia v. EPA,* ___ U.S. ___, 142 S.Ct. 2587 (2022). These new rules could

not be cited in our earlier briefs because they had not yet been issued.

     Saving the planet by suppressing fossil fuels has been in the headlines for

decades. The regulatory salient of this campaign began with the 2009

Endangerment Finding that is the subject of this proceeding. It was shortly

followed by the Triggering Rule,[1] the Tailoring Rule,[2] and later by the Clean Power

---

[1] Reconsideration of Interpretation of Regulations that Determine Pollutants Covered by Clean Air Act Permitting Programs, 75 Fed. Reg. 17004 (Apr. 2, 2010).
[2] Prevention of Significant Deterioration and Title V Greenhouse Gas Tailoring Rule, 75 Fed. Reg. 31514 (June 3, 2010)

Plan,[3] all explicitly premised on the Endangerment Finding. The Tailoring Rule and the Clean Power Plan were invalidated under the major questions doctrine. *UARG v. EPA, supra; West Virginia v. EPA, supra.*

President Biden by Executive Orders a week into his term made clear that he would use the powers of government to the fullest extent to suppress fossil fuels, particularly in the electricity-generating sector. *See Executive Order on Tackling the Climate Crisis at Home and Abroad,* https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/27/executive-order-on-tackling-the-climate-crisis-at-home-and-abroad/ (last visited Jul. 5, 2023);

After *West Virginia v. EPA*, it was clear that sweeping new regulations were coming. However, when this case was briefed in late 2022 and early 2023, those regulations had not yet been issued.

Two days before oral argument EPA proposed a new rule predicated on the Endangerment Finding effectively requiring electrification of all motor vehicles. Reference to this proposed rule was made at the April 14 oral argument. That rule, the Multi-Pollutant Emissions Standards For Light and Medium-Duty Vehicles, 88 Fed. Reg. 29184 (May 5, 2023) (the "Vehicle Rule") was published after oral

---

[3] Emission Guidelines for Greenhouse Gas Emissions From Existing Electric Utility Generating Units; Revisions to Emission Guideline Implementing Regulations; Revisions to New Source Review Program, 83 Fed. Reg. 44746 (Aug. 31, 2018)

argument, but before the panel decision on May 25. EPA issued its new power plant rule, Greenhouse Gas Standards and Guidelines for Fossil Fuel-Fired Power Plants, 88 Fed. Reg. 33240 (May 23, 2023) (the "Power Plant Rule") just before the panel decision.

Though not yet final, the Vehicle Rule and Power Plant Rule, like the Clean Power Plan before them, are having an immediate impact on energy markets and capital investment planning by automakers and utilities, as the Biden Administration is rushing pell-mell to finalize them.[4] [5] *Amid Heated Debates, EPA Steps Up The Pace For Major Climate Rules,* INSIDE EPA'S CLIMATE EXTRA, Jun. 14, 2023, https://insideepa.com/climate-insider/amid-heated-debates-epa-steps-pace-major-climate-rules (subscription, last visited Jun. 20, 2023). Petitioners and markets take seriously the Administration's intention to "tackle" the "existential threat" of "climate change." What the rest of the world sees with eyes as big as saucers should not be invisible to the judiciary.

---

[4] The Vehicle rule is proposed to be finalized on March 30, 2024. *See* https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202304&RIN=2060-AV49 (last visited Jul. 5, 2023).
[5] The Power Plant rule is proposed to be finalized in April 2024. *See* https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202304&RIN=2060-AV09 (last visited Jul. 5, 2023.

### III. BOTH THE VEHICLE RULE AND THE POWER PLANT RULE ARE EXPLICITLY PREMISED ON THE 2009 ENDANGERMENT FINDING

The panel opinion notes at p. 3 that the 2009 Endangerment Finding is related to mobile sources and thus by implication might not support the Petitioners' standing as electricity consumers.

But any implication that the 2009 Endangerment Finding only applies to motor vehicles and not to power plants (and thus, to electricity consumers) is just plain wrong. In fact, the 2009 Endangerment Finding is the fundamental and necessary foundation for each and every element of the current federal regulatory onslaught against fossil fuels. The 2009 Endangerment Finding (74 FR 66496) and its accompanying Technical Support Document (74 FR 66523) provided the supposed scientific basis for finding "endangerment" from emissions of greenhouse gases. The 2010 and 2011 rules applying the Finding to stationary sources relied explicitly on the 2009 Endangerment Finding. And both the new Vehicle Rule and the Power Plant Rule explicitly rely for their scientific foundation on the 2009 Endangerment Finding. 88 Fed. Reg. at 29,207-29,208 (Vehicle Rule); 88 Fed. Reg. at 33,249 (Power Plant Rule). From the Power Plant Rule, 88 Fed. Reg. 33242:3:

> In 2009, the EPA concluded that GHG emissions endanger our nation's public health and welfare. [citing the Endangerment Finding] … Fossil fuel-fired EGUs are the nation's largest stationary source of GHG emissions, representing 25 percent of the United States' total GHG emissions in 2020.

8

Section III of this rule, commencing at 88 Fed. Reg. 33249:1, recapitulates the

Endangerment Finding as its justification. Petitioners showed in their Petition and

supplements that all three lines of evidence on which the Endangerment Finding

rested were invalidated. Petitioners also showed that many of the other EPA

findings recited in the Power Plant Rule, especially those regarding extreme

events, were outrageously false. EPA's response to that showing at both the

administrative and appellate level was an utterly preposterous word salad that has

escaped merits review based on the panel's standing decision.

## IV.   Injury in Fact From the Effect on Electricity Costs To Consumers of Fossil Fuel Suppression is Demonstrated by Government Data.

At multiple points the panel refers to the absence of affidavits from

Petitioners as a basis for finding lack of standing. *E.g.,* "[P]etitioners submitted no

affidavits or other evidence to establish standing, instead merely arguing in their

briefs that the Endangerment Finding has injured them or their members."

Judgment, at 3. But the causal relationship between suppression of fossil fuels and

higher consumer costs of electricity is established by reams of data, all in the

public record, much issuing from the U.S. government itself and therefore

admissible under Fed.R.Evid. 803(8)(a)(ii). The effect includes doubling and

tripling the cost of electricity to consumers in the jurisdictions that have gone the

farthest in suppressing fossil fuels and attempting to replace them with intermittent

renewables (wind and sun) to generate electricity. And even those jurisdictions have not gone as far as the Biden Administration's proposed rules. Relevant data on this subject were cited and quoted in the original Petition for Reconsideration to the EPA, and in Petitioners' briefs to this court. These data are therefore not just admissible public information, but also part of the record of this matter, and referring to them is not merely "arguing in briefs."

The panel does not say and it is not apparent what Petitioners might have said in an affidavit that could meaningfully add to what is clearly shown by the publicly available data on which they relied. Petitioners do not have personal knowledge regarding the relationship between fossil fuel suppression and the consumer cost of electricity beyond what is in the public record. At most, they could have submitted affidavits swearing to the single trivial and undisputed fact that they are each consumers of electricity. Could that one trivial and undisputed fact really be the basis for rejecting their standing to challenge the single most economically significant unscientific scientific determination in the history of the regulatory state? If so, Petitioners respectfully request leave to submit affidavits to cure that trivial defect.

Examples of key matters from the public record specifically cited and relied upon in the Petition for Reconsideration (JA-179), and thus part of the record of

10

this proceeding, include the following (from pages 5-8 of the Petition (JA-185-188):

- California state data as of 2015 as to its U.S.-leading percent generation of electricity from intermittent wind and solar sources (JA-186);

- U.S. EIA data showing California electricity costs approximately 50% higher than the U.S. average in 2015. *Id.*;

- EIA data showing Germany had one of the highest percentages of electricity from wind and sun in in the world. *Id.*;

- Data from Clean Energy Wire showing average German electricity costs in 2015 were triple the U.S. average. *Id.* at JA-186-187;

- Detailed cost data from a demonstration project in Korea of a fully wind/solar electricity generation system for a small island, showing that elimination of fossil fuels would lead to electricity costs of at least five times average U.S. consumer costs. *Id.* at 187-188.

Since the 2017 Petition, the data demonstrating the relationship between fossil fuel suppression and soaring consumer electricity costs has only become more obvious. California's electricity prices are more than double those in over half of the other lower 48 states:[6]

---

[6] Data from U.S. Energy Information Administration, ELECTRIC POWER MONTHLY, Chapter 5, *Table 5.6A, Average Price of Electricity by End-Use Sector, by State,*



Three New England states, with their own, even more aggressive, fossil fuel suppression strategies, have considerably higher electricity prices than California.

_April 2023 and 2022._ https://www.eia.gov/electricity/monthly/ (last visited Jul. 5, 2023).

"A dollar of economic harm is still an injury-in-fact for standing purposes."

*Carpenters Industrial Council v. Zinke*, 854 F.3d 1, 5 (2017). We are far beyond that here.

As we have explained, European electricity prices demonstrate that the more renewables, the higher the prices:[7]

---

[7] Steve Hayward, *The Daily Chart: The Big Green Energy Lie*, POWERLINE BLOG available at https://www.powerlineblog.com/archives/2023/06/the-daily-chart-the-big-green-energy-lie.php, (last visited Jul. 5, 2023).

European Electricity Prices (inc tax) vs Percentage Of Electricity Generated From Wind/Solar

Prices: https://ec.europa.eu/eurostat/databrowser/view/
nrg_pc_204/default/table?lang=en
Generation: https://www.bp.com/en/global/corporate/energy-economics/
statistical-review-of-world-energy.html

   Only willful blindness could obscure that fossil fuel suppression increases

the consumer cost of electricity. Requiring individual consumer affidavits to

establish what is obvious from admissible government statistics is a pretext for

avoiding the merits – which are devastating to the validity of the Endangerment

Finding.

V.   **THE RULES OF STANDING APPLIED TO PETITIONERS ARE INCONSISTENT WITH THOSE APPLIED TO POLITICALLY FAVORED GROUPS LIKE ENVIRONMENTAL ACTIVISTS.**

The economic injury asserted by Petitioners in this matter is large and definitively-established – yet was held insufficient. Meanwhile, for individuals or groups that are politically favored, the law of this and other circuits recognizes standing based on purported harms that are undetectably small, non-economic, inchoate, or even just predicted by models that have never been validated by real world evidence. In environmental cases courts consistently recognize standing even when the real-world evidence definitively refutes the claim of harm or where the harm is totally undetectable by any means known to science.

Consider *Natural Resources Defense Council v. Wheeler*, 955 F.3d 68, 76-77 (2020). There, NRDC claimed standing to challenge an EPA regulation based on an assertion by one member that his coastal property was allegedly "threatened" by climate change. There was no assertion that any of the harm had actually yet occurred, nor when it would occur, nor how it could be redressed by a court order that would have the same power over sea level as the commands of King Canute, but without the humility. In the real world, no evidence has ever established any link between GHG emissions and any supposed enhanced "threats" to coastal property, and all attempts to show that such emissions have led to accelerating sea

15

level rise or increased hurricane activity have failed. No matter. The Court held as

follows:

> Petitioners then have adequately linked the 2018 Rule to an injury-in-fact: the 2018 Rule will lead to an increase in HFC emissions, which will in turn lead to an increase in climate change, which will threaten petitioners' coastal property.

Or consider *Kelsey Cascadia Rose Juliana v. United States*, 947 F.3d 1159

(9th Cir. 2020). This case alleges a constitutional right to a stable climate and asks

the court to order the U.S. government to force an end to all fossil fuel use in this

country. The Ninth Circuit in 2020 held plaintiffs alleged sufficient "injury in fact"

and "traceability" elements (while rejecting redressability) based on allegations

that:

> Kelsey spends time along the Oregon coast in places like Yachats and Florence and enjoys playing on the beach, tidepooling, and observing unique marine animals. . . . The current and projected drought and lack of snow caused by Defendants are already harming all of the places Kelsey enjoys visiting, as well as her drinking water, and her food sources—including wild salmon. . . . Defendants have caused psychological and emotional harm to Kelsey as a result of her fear of a changing climate, her knowledge of the impacts that will occur in her lifetime, and her knowledge that Defendants are continuing to cause harms that threaten her life and wellbeing.

Complaint for Declaratory and Injunctive Relief, 2015 WL 4747094 (D.Or.).

If Petitioners were not obliged to spend more on electricity, they would have

more left over for "playing on the beach, tidepooling, and observing unique marine

animals." The causal chain to higher electricity prices cited by Petitioners is far

more direct and obvious than the speculative chain of fallacious inferences held sufficient in *NRDC v. Wheeler*, *Juliana* and *Massachusetts v. EPA.*

The linchpin of the *Juliana* plaintiffs' claim of injury is the "projected drought and lack of snow" due to "climate disruption." In reality, many areas in the Pacific Northwest had well above normal snow last winter.[8] Many western ski resorts had abundant if not record snow this past winter.[9] Mere empirical falsification of the *Juliana* plaintiffs' speculative lamentations poses no problem to their standing. For a favored environmental plaintiff, wild speculation as to imaginary harm, even when definitively refuted by subsequent events, is nonetheless sufficient.

Petitioners here are not challenging decisions on standing of environmental plaintiffs. What they are challenging is the shockingly inconsistent standard applied to Petitioners. When an environmental plaintiff claims a "threat" to coastal property from a regulatory change that through a long and speculative causal chain is said to cause a rise in sea level that would be orders of magnitude below the threshold of detection, that is sufficient to confer standing. But when a consumer

---

[8] U.S. Dept. of Agriculture, Natural Resources Conservation Service, National Water and Climate Center, Westwide SNOTEL Water Year (Oct 1) to Date Precipitation % of Normal https://www.wcc.nrcs.usda.gov/ftpref/data/water/wcs/gis/maps/west_wytdprecpctnormal_update.pdf (last visited Jul. 2, 2023)
[9] 2022-23 Ski Season Analysis as of May 27, 2023, Bestsnow.net, https://bestsnow.net/seas23.htm (last visited Jul. 2, 2023).

group makes a definitive showing based on admissible government data of

substantial economic harm, that is not sufficient. Such a glaring double standard is

the mortal enemy of equal justice.

Standing is a constitutional doctrine and should be applied evenly. If the

panel's decision accurately reflects that law and is allowed to stand it is a blot and

a stain upon the law.[10]

## VI.    ENTITIES REPRESENTING THE INTERESTS OF CONSUMERS ARE THE ONLY ONES WITH THE INTEREST AND INCENTIVE TO CHALLENGE EPA'S ENDANGERMENT FINDING.

The panel's decision forces to the sidelines not just the only entities who

have in fact challenged the Endangerment Finding, but the only entities that have

the interest and incentive to do so.

The Judgment notes that the law of this Circuit grants standing to entities

"directly regulated by the challenged rule," but that neither Petitioner fits that

criterion. Judgment, at 3. True, no one is "directly regulated" by the Endangerment

Finding but standing to challenge it was not an issue in *Coal. for Responsible*

*Regul., Inc. v. E.P.A.*, 684 F.3d 102 (D.C. Cir. 2012), *aff'd in part, rev'd in part sub*

---

[10] Petitioners are hardly the first to note inconsistencies in the law of standing. *See*, e.g., disagreements on standing between majority, concurring and dissenting opinions in *U.S. v. Texas*, ___ U.S. ___, Case No. No. 22–58 (Jun. 23, 2023); and *Sierra v. City of Hallandale Beach, Florida*, 996 F.3d 1110, 1115 (2021) (Newsom, J., concurring).

*nom. Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302 (2014), and *amended sub nom. Coal. for Responsible Regul., Inc. v. Env't Prot. Agency*, 606 F. App'x 6 (D.C. Cir. 2015). It is the follow-on rules triggered by the Endangerment Finding that impose regulation. But even granting that electric utilities and/or vehicle manufacturers are "directly regulated," they will necessarily pass the costs of the regulation on to consumers like Petitioners. Moreover, so far these industries have decided not to challenge the Endangerment Finding.

Utilities will be forced by the new Power Plant rule to close or pay hundreds of billions of dollars to modify existing fossil fuel plants and to build intermittent renewable generation. Economically, however, this decision is a bonanza for utilities because they have guaranteed return on capital investment, so the more they invest the higher their returns. Nor will the unregulated entities that build renewable generation facilities and benefit from hundreds of billions in subsidies and tax credits do anything to threaten the goose laying their golden egg.

The automobile manufacturers, meanwhile, are both bribed and coerced with hundreds of billions in subsidies and tax credits. At the same time, they have long lead times to develop new vehicles, so if they delay switching their line-ups to electric vehicles, they risk being put entirely out of business when the rule takes effect. Therefore, despite increasing push back from auto dealers and consumers, all of the vehicle manufacturers have thus far bent to the government's will.

19

That leaves only groups like CHECC and FAIR to challenge the Endangerment Finding. The members of these entities have a very real and large economic stake that this court should recognize.

## CONCLUSION

Climate policies will radically transform America and immiserate millions if carried to their logical ends, all driven by an Endangerment Finding that rests on a pyramid of fraud and logical fallacies. This house of cards is insulated from challenge by deeming Petitioners to not have standing despite copious government data showing that GHG regulation increases their electricity prices. The Petitioners have standing, and the merits of their appeal – which invalidate the entire house of cards – should be considered.

Respectfully submitted this 10th day of July 2023.

/s/ Harry W. MacDougald
Harry W. MacDougald
Georgia Bar No. 463076
Caldwell, Carlson, Elliott & DeLoach LLP
Two Ravinia Drive, Suite 1600
Atlanta, Georgia 30346
(404) 843-1956
hmacdougald@ccedlaw.com

/s/ Francis Menton
Francis Menton
Law Office of Francis Menton
85 Broad Street, 18th floor
New York, New York 10004
(212) 627-1796

fmenton@manhattancontrarian.com

Attorneys for Concerned Household
       Electricity Consumers Council and its
members *and*

FAIR Energy Foundation

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME AND TYPEFACE LIMITATIONS

I HEREBY CERTIFY THAT that the foregoing **Petition for Panel Rehearing and Rehearing en Banc** complies with the type-volume limitations of Fed. R. App. P. 35(b)(2), 40(b) and D.C. Cir. Rule 35(b). As determined by the Microsoft Word software used to produce this brief, it contains 3,891 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Circuit Rule 32(a)(1).

I further certify that this document is prepared using the Times New Roman font in the 14-point size.

Dated: July 10, 2023.

> /s/ Harry W. MacDougald
> Harry W. MacDougald
> Georgia Bar No. 463076
>
> *Counsel for Petitioners*

Caldwell, Carlson, Elliott & DeLoach LLP
Two Ravinia Drive, Suite 1600
Atlanta, Georgia 30346
(404) 843-1956
hmacdougald@ccedlaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing

Petitioners' Combined Petition for Panel Rehearing and Rehearing en banc was

filed electronically with the Court by using the CM/ECF system on this 10th day of

July 2023. Counsel for the Respondent and Respondent's Intervenors are registered

CM/ECF users and will be served by the appellate CM/ECF system. In addition,

service by email will be made upon the following Counsel for the Respondent and

Respondent's Intervenors at the email addresses indicated below.


July 10, 2023.

Brian Lynk
U.S. Department of Justice
Energy and Natural Resources Division
brian.lynk@usdoj.gov

Sean Donahue
Donahue & Goldberg, LLP
sean@donahuegoldberg.com

/s/ Harry W. MacDougald
Harry W. MacDougald
Georgia Bar No. 463076

*Counsel for Petitioners*

Caldwell, Carlson, Elliott & DeLoach LLP
Two Ravinia Drive, Suite 1600
Atlanta, Georgia 30346
(404) 843-1956
hmacdougald@ccedlaw.com

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), the Petitioners state as follows:

**(A)  Parties and *Amici***

**PETITIONERS**:

**Case No. 22-1139**:

Concerned Household Electricity Consumers Council is an unincorporated association of the following individuals:

> Joseph D'Aleo
> Clement Dwyer, Jr.
> Scott Univer
> Robin Weaver
> James P. Wallace III

**Case No. 22-1140**:

FAIR Energy Foundation, a 501(c)(3) non-profit that is not owned by and has no interest in any other entity.

**RESPONDENTS:**

United States Environmental Protection Agency (Respondent in the consolidated cases)

**RESPONDENTS' INTERVENORS:**

American Lung Association
American Public Health Association
Appalachian Mountain Club
Clean Air Council
Clean Wisconsin
Environmental Defense Fund
National Parks Conservation Association
Natural Resources Council of Maine

**PETITIONERS' *AMICI CURIAE*:**

CO2 Coalition, Inc. (Richard Lindzen, Ph.D., and Will Happer, Ph.D.)

**RESPONDENTS' *AMICI CURIAE*:**

Climate scientists Christopher Field, Michael Oppenheimer, and Susan Solomon.

**(B)    Rulings Under Review**

These petitions challenge EPA's Denial of Petitioners' Petitions to Reconsider the 2009 Endangerment Finding for greenhouse gases. *See* Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act; Final Action on Petitions, 87 Fed. Reg. 25412 (Apr. 29, 2022) (referred to herein as the "Denial").

**(C)    Related Cases**

A challenge to the underlying Endangerment Finding for Greenhouse Gases upon its initial promulgation was rejected by this Court in *Coal. for Responsible Regul., Inc. v. E.P.A.*, 684 F.3d 102, 120 (D.C. Cir. 2012), *aff'd in part, rev'd in part sub nom. Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 134 S. Ct. 2427, 189 L. Ed. 2d 372 (2014), and *amended sub nom. Coal. for Responsible Regul., Inc. v. Env't Prot. Agency*, 606 F. App'x 6 (D.C. Cir. 2015).

There are no pending related cases.

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

No. 22-1139                       **September Term, 2022**

FILED ON: MAY 25, 2023

CONCERNED HOUSEHOLD ELECTRICITY CONSUMERS COUNCIL, ET AL.,
PETITIONERS

v.

ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENT

AMERICAN LUNG ASSOCIATION, ET AL.,
INTERVENORS

————————————

Consolidated with 22-1140      ———

On Petitions for Review of a Final Action
of the Environmental Protection Agency

———

Before: HENDERSON, KATSAS, and PAN, *Circuit Judges*.

## J U D G M E N T

These consolidated cases were considered on the record from the Environmental Protection Agency and on the briefs and arguments of the parties. The Court has accorded the issues full consideration and determined that they do not warrant a published opinion. *See* D.C. Cir. R. 36(d). For the reasons stated below, it is:

**ORDERED** that the petitions for review filed by the Concerned Household Electricity Consumers Council and the FAIR Energy Foundation are **DISMISSED**.

\*     \*     \*

The Concerned Household Electricity Consumers Council ("CHECC") and the FAIR Energy Foundation ("FAIR") unsuccessfully petitioned the Environmental Protection Agency ("EPA") to reconsider its 2009 finding that greenhouse gas emissions from motor vehicles contribute to climate change and thus endanger public health and welfare. CHECC and FAIR now ask this court to review the EPA's decision not to reconsider the 2009 finding. *See* CHECC Am.

Pet. for Rev. (June 28, 2022); FAIR Am. Pet. for Rev. (June 29, 2022); *see also* 42 U.S.C. § 7607(b)(1) (providing for direct review in the D.C. Circuit). We dismiss both cases for lack of standing.

Section 202 of the Clean Air Act requires the EPA to regulate "any air pollutant from any class or classes of new motor vehicles or new motor vehicle engines, which in [its] judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. § 7521(a)(1). In 2009, the EPA found that greenhouse gases from motor vehicles meet that statutory standard for regulation. *See* Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act, 74 Fed. Reg. 66,496, 66,497–99 (Dec. 15, 2009) (the "Endangerment Finding"); *see also Massachusetts v. EPA*, 549 U.S. 497, 528–32 (2007) (holding that the Clean Air Act authorizes the EPA to regulate greenhouse gas emissions). In the face of numerous challenges from states and industry groups, we upheld the Endangerment Finding and the EPA's denials of various petitions for reconsideration of that Finding. *See Coal. for Responsible Regul., Inc. v. EPA*, 684 F.3d 102, 116–26 (D.C. Cir. 2012) (per curiam), *rev'd in part on other grounds sub nom. Util. Air Regul. Grp. v. EPA*, 573 U.S. 302 (2014).

CHECC and FAIR filed new petitions for reconsideration of the Endangerment Finding in 2017 and 2019, respectively. In the alternative, they asked the EPA to conduct a new rulemaking under § 553(e) of the Administrative Procedure Act to issue "a new 'Non-Endangerment Finding.'" *See* CHECC 2017 Pet. 1, 4; FAIR 2019 Pet. 3–4, 6; *see also* 5 U.S.C. § 553(e); 42 U.S.C. § 7607(d)(7)(B). The petitions argue that "[s]cientific research since the adoption of the Endangerment Finding has invalidated" the EPA's earlier conclusions regarding the link between greenhouse gas emissions and climate change. CHECC 2017 Pet. 1; *see also* FAIR 2019 Pet. 2. The EPA issued its final denial of the petitions for reconsideration in April 2022. *See* Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act; Final Action on Petitions, 87 Fed. Reg. 25,412 (April 29, 2022). In denying the petitions, the EPA determined that the arguments and evidence that CHECC and FAIR proffered to challenge the Endangerment Finding were "inadequate, erroneous, and deficient." *See* EPA's Denial of Petitions Relating to the Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act, at 1 (April 29, 2022), https://www.regulations.gov/document/EPA-HQ-OAR-2022-0129-0053.

Article III of the Constitution "limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559 (1992). Petitioners seeking relief from this court must therefore show that they meet "the irreducible constitutional minimum of standing," which requires (1) "an injury in fact . . . which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical"; (2) "a causal connection between the injury and the conduct complained of"; and (3) proof that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id*. at 560–61 (cleaned up).

Petitioners fail to meet their burden to establish standing because they provide no evidence that they or any of their members have been injured by the Endangerment Finding. It is well established that "a petitioner whose standing is not self[-]evident should establish its standing by the submission of its arguments and any affidavits or other evidence appurtenant thereto . . . with

the petitioner's opening brief." *Sierra Club v. EPA*, 292 F.3d 895, 900 (D.C. Cir. 2002). "[T]he petitioner may carry its burden of production by citing any record evidence relevant to its claim of standing and, if necessary, appending to its filing additional affidavits or other evidence sufficient to support its claim." *Id.* at 900–01; *see also Twin Rivers Paper Co. v. SEC*, 934 F.3d 607, 613 (D.C. Cir. 2019) (collecting cases and noting that "[w]e have reiterated these principles many times"); D.C. Cir. R. 28(a)(7) (codifying this requirement in our local rules).

Here, it is not self-evident from the administrative record that the Endangerment Finding injures petitioners. Neither CHECC nor FAIR is "directly regulated by the challenged rule." *Am. Fuel & Petrochem. Mfrs. v. EPA*, 3 F.4th 373, 379 (D.C. Cir. 2021) (citing *Sierra Club*, 292 F.3d at 900). Yet petitioners submitted no affidavits or other evidence to establish standing, instead merely arguing in their briefs that the Endangerment Finding has injured them or their members. *See* Pet'rs' Br. 31–35. Of course, arguments in "briefs 'are not evidence.'" *Twin Rivers*, 934 F.3d at 613 (quoting *Sierra Club*, 292 F.3d at 901). Under our precedents and Circuit Rule 28(a)(7), petitioners' failure to provide evidence of any injury from the Endangerment Finding is a sufficient ground to dismiss these cases for lack of standing. *See, e.g.*, *Transp. Div. of Int'l Ass'n of Sheet Metal, Air, Rail & Transp. Workers v. Fed. R.R. Admin.*, 40 F.4th 646, 660–61 (D.C. Cir. 2022) (holding that petitioners lacked standing because they "neither identified record evidence nor submitted new evidence to this court showing that they have members who" were affected by the challenged agency action); *Util. Workers Union of Am. Loc. 464 v. FERC*, 896 F.3d 573, 578 (D.C. Cir. 2018) (holding that petitioners who "made only conclusory assertions" but "offer[ed] no new affidavits" of cognizable injury lacked standing); *Am. Chemistry Council v. Dep't of Transp.*, 468 F.3d 810, 819 (D.C. Cir. 2006) (dismissing petition for review where "petitioners submitted no affidavits or other forms of evidence" of cognizable injury); *City of Waukesha v. EPA*, 320 F.3d 228, 237 (D.C. Cir. 2003) (holding that advocacy group that "provided no affidavit that establishes with specificity and concreteness any particular member . . . that is likely to suffer increased drinking water costs" had failed to establish standing).

In any event, petitioners' theories of standing are fatally flawed. CHECC's claim of representational standing fails because CHECC's arguments do not demonstrate that "at least one of its members [has] standing to bring the petition in his or her own right." *Cmtys. Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 684 (D.C. Cir. 2004) (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). CHECC says only that its members are each "a U.S. citizen and a member of a household that pays electricity bills" and that the Endangerment Finding will lead to regulations that increase the households' electricity rates. Pet'rs' Br. 31. But CHECC draws no connection between the Endangerment Finding (which compels the regulation of *motor vehicle* emissions under § 202(a) of the Clean Air Act) and the price of residential electricity. Indeed, CHECC's brief does not identify a single regulation based on the Endangerment Finding that has affected its members. Because CHECC has failed to establish that the Endangerment Finding injured any of its members, it lacks representational standing.

Next, FAIR and CHECC both claim organizational standing — that is, standing to sue in their own rights, rather than on behalf of their members. To evaluate this argument, "we ask, first, whether the agency's action or omission to act 'injured the organization's interest' and, second, whether the organization 'used its resources to counteract that harm.'" *PETA v. USDA*, 797 F.3d 1087, 1094 (D.C. Cir. 2015) (alteration omitted) (quoting *Equal Rts. Ctr. v. Post Props., Inc.*, 633

F.3d 1136, 1140 (D.C. Cir. 2011)); *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (explaining that an organization must assert "more than simply a setback to the organization's abstract social interests"). CHECC's organizational standing argument founders at the outset because it never states what its mission *is*, much less how the Endangerment Finding affects that mission or causes CHECC to expend resources. *See* Pet'rs' Br. 34. For its part, FAIR explains that it "seeks to educate policy makers and the public that abundant energy is the core driver of global prosperity and that free-market energy policies and energy abundance will produce prosperity, security[,] and human flourishing around the world." *Id.* at 33–34. But FAIR gives no hint about how it "used its resources to counteract [any alleged] harm" from the Endangerment Finding. *PETA*, 797 F.3d at 1094 (citation omitted). Accordingly, FAIR has asserted "simply a setback to the organization's abstract social interests," which is insufficient to establish standing. *Havens Realty*, 455 U.S. at 379.

Petitioners' reply brief raises additional arguments in favor of standing. *See* Pet'rs' Reply Br. 3–8. Because those contentions did not appear in petitioners' opening brief, they are forfeited. *See Scenic Am., Inc. v. Dep't of Transp.*, 836 F.3d 42, 53 n.4 (D.C. Cir. 2016) (explaining that parties may forfeit arguments that we have jurisdiction); *Sierra Club*, 292 F.3d at 900 (requiring petitioners to demonstrate standing in their "opening brief"). In any case, we have reviewed the additional arguments and have determined that they are without merit.

For the foregoing reasons, we dismiss the petitions for review for lack of jurisdiction.

Pursuant to D.C. Circuit Rule 36, this disposition will not be published. The Clerk is directed to withhold issuance of the mandate until seven days after resolution of any timely petition for rehearing or petition for rehearing *en banc*. *See* Fed. R. App. P. 41(b); D.C. Cir. R. 41(a)(1).

### Per Curiam

FOR THE COURT:
Mark J. Langer, Clerk

BY:  /s/
Daniel J. Reidy
Deputy Clerk